PEOPLE v LILLIS

1. Searches and Seizures—Automobiles—Reasonableness—Police.

The following rules apply with respect to stopping, searching and seizing motor vehicles: (1) reasonableness is the test that is to be applied for both the stop of, and the search of, moving motor vehicles, (2) said reasonableness will be determined from the facts and circumstances of each case, (3) fewer foundation facts are necessary to support a finding of reasonableness when moving vehicles are involved, than if a house or a home were involved, and (4) a stop of a motor vehicle for investigatory purposes may be based upon fewer facts than those necessary to support a finding of reasonableness where both a stop and a search is conducted by the police.

2. Searches and Seizures—Automobiles—Police—Investigatory Stop—Available Facts—Reasonable Man.

The reasonableness of the action of a police officer in stopping a motor vehicle for investigatory purposes is measured by an objective standard and may be determined by weighing the experience and information of the officer against the degree of intrusion; where the facts available to the officer at the moment of the seizure or the search would warrant a man of reasonable caution in the belief that the action taken was appropriate, his action will be upheld, but he must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the stop.

3. Searches and Seizures—Constitutional Law—Investigatory Stop—Suspicion—Belief.

The basis for detention for an investigatory stop is reasonable *suspicion* or the *possibility* under the circumstances that criminal activity may be afoot rather than probable cause to arrest

References for Points in Headnotes

[1–4] 68 Am Jur 2d, Searches and Seizures §§ 16, 34, 57.
    Validity, under Federal Constitution, of warrantless search of automobiles—Supreme Court cases. 26 L Ed 2d 893.
[2–4] 68 Am Jur 2d, Searches and Seizures §§ 40, 43, 45, 99.
[4] 68 Am Jur 2d, Searches and Seizures § 85.

which consists of the officer's reasonable *belief* or the probability under the circumstances that criminal activity is afoot.

4. SEARCHES AND SEIZURES—INVESTIGATORY STOP—REASONABLE BELIEF —PROTECTIVE SEARCH—CONCEALED WEAPONS.

A police officer making a reasonable investigatory stop who has reason to believe that the suspect is armed and dangerous may conduct a protective search for concealed weapons, limited in scope to this protective purpose.

Appeal from Kent, Stuart Hoffius, J. Submitted June 3, 1975, at Grand Rapids. (Docket No. 22431.) Decided August 28, 1975.

Robert J. Lillis was convicted of carrying a concealed weapon in a motor vehicle. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Harold S. Sawyer,* Prosecuting Attorney, *Donald A. Johnston, III,* Chief Assistant Prosecuting Attorney, and *Craig S. Neckers,* Assistant Prosecuting Attorney, for the people.

*William E. Jackson,* for defendant on appeal.

Before: McGREGOR, P. J., and D. E. HOLBROOK and N. J. KAUFMAN, JJ.

N. J. KAUFMAN, J. On October 17, 1974, after a bench trial in Kent County Circuit Court, defendant was found guilty of carrying a concealed weapon in a motor vehicle, MCLA 750.227; MSA 28.424. He was subsequently sentenced to a term of from 3 to 5 years and now appeals of right.

The sole issue to be decided on appeal is whether the trial court committed error by denying defense motions to suppress the gun which the police took from defendant and which served as

the basis for his conviction. The gun was discovered when police frisked defendant after they had stopped the car in which he was riding. Defendant contends that the evidence should have been suppressed because the police had insufficient cause to stop the car and to frisk defendant. Evidence at a pre-trial suppression hearing and at trial, prior to defendant's motion at the close of testimony, indicated that the Grand Rapids police, in stopping the car, were acting on a belief that an escaped prisoner was in the car.

The events precipitating defendant's arrest began when the Bay County Sheriff's office informed the Kent County Sheriff's office that an individual named Freddie Tompkins had escaped from Jackson Prison and might be in Grand Rapids where he was the leader of a motorcycle club, the Outlaws. The Bay County officials had received this information from an unnamed "reliable informant". A picture, physical description and rap sheet of Tompkins was sent to the Kent County Sheriff's office which, in turn, forwarded the information to the Grand Rapids police.

According to the information supplied to the Grand Rapids police, Tompkins was described as being 5 feet 7 inches, weighing 150 pounds and as having a small build, fair complexion, brown hair, blue eyes and tatoos on both arms. The Bay County officials indicated that Tompkins might have a beard or moustache.

This description was distributed to Grand Rapids police officers on July 15, 1974. At this time, the Grand Rapids police verified the fact that Tompkins had, in fact, escaped from Jackson. Two days later, Officer Kropewnicki, while on patrol, spotted a man whom he thought was Tompkins. The suspect was riding in the back seat of a car for which

Officer Kropewnicki had been looking. The officer testified that he was looking for this car because, a month earlier, it had been used by the Outlaw Motorcycle Club in a matter which he had investigated. Officer Kropewnicki based his suspicion that the rear-seat passenger was Tompkins on the prior use of the car by the Outlaws and on the fact that the suspect had "medium length brownish hair", a moustache, and a thin build. The officer had seen a picture of the escapee two days earlier.

Officer Kropewnicki, however, felt that his view of the man in the rear seat was not good enough to justify his stopping the car and arresting the suspect. Because of this, he requested help from Officers Price and Crace who had also seen Tompkins' picture and might verify his suspicion. Price and Crace, who were on plain-clothes duty, followed the suspect car to a party store and watched its three occupants enter and leave the store. They were some 150 yards away at this point. Officer Price testified that he could not make a determination from that distance and that he relied on Officer Crace, who was looking at the three men through binoculars. Officer Crace denied that he was using binoculars and testified that he could not distinctly make out any facial features, height, weight, or age. Crace, in determining that the suspect might be Tompkins, relied on the suspect's hair length and moustache, viewed in light of the connection of the car with the Outlaws and of Officer Kropewnicki's suspicion.

When the car left the party store, a marked police car joined the others and on orders from Kropewnicki pulled it over. Officer Price testified that, at this point, three officers approached the car with drawn guns. Each ordered a different occupant out of the car. Officer Price asked defend-

ant, the passenger in the front seat, to step out of the car. At this point, Officer Price claimed he saw a bulge in defendant's waistband and, believing that defendant might have a gun, frisked that part of his body. The officer stated that he carried his gun in the same place when on plain-clothes duty. Upon discovering a gun, Price conducted a full pat down of defendant, then placed him under arrest. The other officers had discovered that the suspect in the rear seat was not Tompkins and released him and the driver.

Our initial determination is whether the police had sufficient cause to stop the car in which defendant was a passenger. In *People v Whalen,* 390 Mich 672, 682; 213 NW2d 116 (1973), the Supreme Court established rules "with respect to the stopping, searching and seizing of motor vehicles and their contents:

"1. Reasonableness is the test that is to be applied for both the stop of, and the search of moving motor vehicles.

"2. Said reasonableness will be determined from the facts and circumstances of each case.

"3. Fewer foundation facts are necessary to support a finding of reasonableness when moving vehicles are involved, than if a house or a home were involved.

"4. *A stop of a motor vehicle for investigatory purposes may be based upon fewer facts than those necessary to support a finding of reasonableness where both a stop and a search is conducted by the police."* (Emphasis supplied.)

The Supreme Court did not detail the parameters of "reasonableness" of investigatory stops. By the very nature of the rules, they must be interpreted on a case-by-case basis. In *People v Whalen, supra,* the Court found reasonable a stop made

pursuant to a tip from an eyewitness to a robbery which had occurred shortly before the stop. The witness gave police a description of the robbers and of their car. The police stopped the car in which defendant was riding when it and its passengers fit the description.

In *People v Parisi,* 393 Mich 31; 222 NW2d 757 (1974), the Court found the stop to have been unreasonable. There, a policeman stopped defendant's car because it was going 25 mph in a 45 mph zone, because he felt the occupants were violating a local curfew, and because of a concern that the occupants were "sleeping or ill". *Id.* at 35. The Court noted that no minimum speed laws had been broken and that the curfew did not apply to occupants of autos. As such, there was not "suspicious activity" enough to justify the stop. *Id.* at 37. Further:

"The factual foundations for the decisions in *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), and *Adams v Williams,* 407 US 143; 92 S Ct 1921; 32 L Ed 2d 612 (1972), are not present here."

*Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), and *Adams v Williams,* 407 US 143; 92 S Ct 1921; 32 L Ed 2d 612 (1972), which applied the *Terry* standards to determining the validity of a stop as well as of a frisk, provide some guidance. In *Terry,* the Court held that the actions of police officers would be measured by an "objective standard":

"would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" (Citations omitted.) 392 US 1 at 21-22.

See also *Adams v Williams, supra* at 145–146. In justifying a stop, the police must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. *Terry, supra* at 21.

Probable cause to arrest is not necessary for an investigatory stop. What is necessary is a reasonable belief "that criminal activity *may be* afoot". Id. at 30. (Emphasis supplied.) As one commentator notes, in relation to statutes which authorize investigatory stops:

"Probable cause is the officer's reasonable *belief*—the *probability* under the circumstances. The basis for detention under the stop and frisk statute is reasonable *suspicion*—the *possibility* under the circumstances." (Emphasis in original.) Stern, *Stop and Frisk: An Historical Answer to a Modern Problem,* 58 J Crim L C P S 532, 536 (1967).

See also LeFave, *"Street Encounters" and the Constitution: Terry, Sibron, Peters & Beyond,* 67 Mich L Rev 39, 62–84 (1968).

Courts generally view the investigatory stop as a device necessary to the detection of crime, both committed and planned. See Tiffany, McIntyre and Rotenburg: *Detection of Crime: Stopping & Questioning, Search & Seizure, Encouragement & Entrapment* (Little Brown & Co, 1967), pp 9–10. Considerable discretion has been given in the investigatory aspect of police work. The Michigan Supreme Court in *People v Whalen,* 390 Mich 672, 680; 213 NW2d 116 (1973), quoted the oft-cited language of Justice Rehnquist in *Adams v Williams* (at 145):

"The Fourth Amendment does not require a policeman who lacks the precise level of information neces-

sary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response."

Although the majority in *Adams* did not expressly acknowledge it, *Terry* also recognizes that "good police work" is also characterized by the avoidance of intrusions upon personal privacy in violation of the Fourth Amendment.

Thus, in adjudging police behavior, a court must examine three important factors: (1) nature and source of the information on which the stop is based, (2) the experience of the police officers involved, and (3) the degree of intrusion involved in the stop. Reasonableness may be determined by weighing the experience and information against the degree of intrusion.

We find that the investigatory stop of the car in which defendant was riding was reasonable. We find that the reasonableness of this stop stems from the fact that an individual who might fit the escapee's description was riding in a car known to be used by a gang which he led and whose aid he might seek. The fact that Tompkins had escaped was verified by the police. The officers knew from information provided by a reliable source that Tompkins was a leader of a Grand Rapids motorcycle gang. It would seem reasonable to conclude that an escaped prisoner would seek the safety of an area well known to him and of friends who might conceal him. Officer Kropewnicki had personal knowledge that the car in question had recently been used by Tompkins' motorcycle gang. All three of the investigating officers had seen Tompkins' picture and physical identification within two days of the stop, and all were experi-

enced in police work. Their inability to obtain a precise view of the suspect is attributable to their fear of approaching close enough to alarm the suspect and to cause the occupants of the car to flee. The temporary stop of this vehicle did not amount to a degree of intrusion great enough to contravene prudent police activity based on a reasonable belief that criminal activity might be occurring.

Having found the investigatory stop to have been reasonable, we must determine whether the subsequent frisk of defendant was also reasonable. We find that it was. The Supreme Court in *Adams v Williams, supra,* at 146, summarized the *Terry* standards for a protective frisk after a reasonable stop:

"The Court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. 'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' he may conduct a limited protective search for concealed weapons. 392 U.S., at 24. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * * . So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose. *Id.,* at 30." (Footnote omitted.)

At the time defendant was ordered out of the car, the arresting officer did not yet know that the suspect was not Tompkins. It was appropriate for the police to get all of the occupants out of the car so that none might help the escapee or, on the

other hand, be accidentally injured when the police attempted to subdue him. The arresting officer stated that, when in plain clothes, he carried his service revolver in his waistband. He, therefore, immediately viewed the bulge in defendant's waistband as a threat. From these facts we find this view and the resultant frisk to have been reasonable. As such, the gun was legally seized, and the court's refusal to suppress it was correct.

Affirmed.