## PEOPLE v SANDS

1. ARREST—DEFINITION—WORDS AND PHRASES.

An arrest is the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest; the act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested.

2. ARREST—CONFESSION—FRUIT OF POISONOUS TREE—EVIDENCE—PROBABLE CAUSE TO ARREST.

The arrest of a defendant was valid and the confession of the defendant was not the fruit of the poisonous tree and the trial judge properly admitted the confession as evidence where a review of the facts indicates that there were sufficient facts known to the police at the time of defendant's arrest to justify a finding of probable cause to arrest the defendant.

3. CRIMINAL LAW—EVIDENCE—TRACKING-DOG EVIDENCE—ADMISSIBILITY—PROPER FOUNDATION.

Tracking-dog evidence is admissible in criminal cases where a proper foundation is laid which will show that: (1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it.

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Arrest § 1.
[2] 5 Am Jur 2d, Arrest § 48.
29 Am Jur 2d, Evidence § 531.
[3, 4] 29 Am Jur 2d, Evidence §§ 378, 379.
Evidence of trailing by dogs in criminal cases. 18 ALR3d 1221.
[4] 4 Am Jur 2d, Appeal and Error § 517.
5 Am Jur 2d, Appeal and Error § 602.

4. Appeal and Error—Criminal Law—Evidence—Admission of Evidence—Specific Objection—Preserving Issue—Manifest Injustice—Tracking-Dog Evidence.

> A specific objection to the admission of evidence cannot be raised for the first time on appeal, absent a showing of manifest injustice; there was no manifest injustice in the admission of tracking-dog evidence although not all of the foundational requirements for the admission of such evidence were met where the evidence against a defendant was overwhelming and the admission of the testimony regarding the tracking dog could not have aided an otherwise undecided juror on the issue of the defendant's guilt beyond a reasonable doubt.

Appeal from Oakland, John N. O'Brien, J. Submitted January 5, 1978, at Lansing. (Docket No. 28737.) Decided March 20, 1978.

Ronald L. Sands was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *Thomas S. Richards,* Assistant Prosecuting Attorney, for the people.

*Leitman & Roeser,* for defendant on appeal.

Before: V. J. Brennan, P. J., and D. E. Holbrook and R. B. Martin,* JJ.

D. E. Holbrook, J. On December 12, 1975, defendant was convicted by an Oakland County Circuit Court jury of first-degree murder, contrary to MCLA 750.316; MSA 28.548. On January 15, 1976, defendant was sentenced to life in prison with credit for 411 jail days served. Defendant appeals as of right.

This case arose from the murder of two attend-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

ants at a Tulsa gas station during the course of an armed robbery at approximately 6 a.m., on November 30, 1974. A recitation of the facts is important for an understanding of the issues raised upon appeal.

At 3:05 p.m., on November 30, 1974, the defendant confessed to the double homicide. On May 21, 1975, the defendant filed a motion to suppress the confession and for an evidentiary hearing. On September 24, 25, 26 and 30, 1975, the circuit court judge held an evidentiary hearing on admission of the confession pursuant to *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965). On November 24, 1975, the trial court denied the motion to suppress and the confession was subsequently read into evidence at the trial.

Testimony at the *Walker* hearing disclosed that the bodies of the two attendants were found inside the bathroom of a Tulsa gas station. The bodies were found shortly after 6 a.m., on November 30, 1974. At 6:30 a.m., on that date, defendant was observed by a deputy sheriff entering a restaurant located about 10 to 15 minutes from the murder scene. Defendant was with three other persons: co-defendant Kowalski, Stella Kowalski and Debbie McLaughlin, the defendant's girlfriend. The deputy sheriff, who had just finished having breakfast in the restaurant, spoke briefly to defendant on his way out. The deputy, who was aware there had been a shooting at the Tulsa gas station, mentioned it to defendant because he knew defendant had previously worked at the gas station.

Upon leaving the restaurant, the deputy sheriff drove to the Tulsa gas station to see if he could be of any assistance. He spoke with the officer in charge, Detective Lister, and mentioned that he had just seen defendant at the restaurant. Detec-

tive Lister requested the deputy to return to the restaurant and ask defendant if he would come to the gas station so that Lister could talk with him. Lister thought that defendant was or could be a suspect.

The deputy sheriff returned to the restaurant and found defendant still sitting in a booth. The deputy approached defendant and stated that there had been a shooting at the Tulsa station. He asked defendant if he remembered Detective Lister and defendant answered "Yes".[1] Defendant was told that Lister would like to talk to him at the Tulsa gas station, *if* that was alright, and the defendant said it was fine. Together with the two women, defendant and Kowalski entered Kowalski's car and drove to the gas station. The deputy stated that defendant was not placed under arrest and went "strictly voluntarily". The defendant and Kowalski arrived at the Tulsa gas station shortly after 7 a.m. The defendant walked over to Lister's police vehicle and after an initial perfunctory conversation, Lister advised the defendant of his rights, which the defendant stated he understood. Lister asked defendant if he wanted an attorney and defendant said no, because he hadn't done anything. Lister asked the defendant if he would waive his rights not to answer questions, and defendant said, "Yes". Lister then asked him what his movements were "from midnight on". This questioning, to which defendant responded, lasted until approximately 7:15 a.m. After defendant gave an exculpatory story,[2] he was told that he

---

[1] Detective Lister and the defendant had met previously in regard to an investigation of a theft of $1,400 from this Tulsa station. Defendant had admitted to Lister that he had stolen the money and was going to pay it back to the owner. The defendant had been dismissed from his job at the Tulsa station because of this theft.

[2] Lister testified that the first time he had a conversation with the defendant, the latter indicated that he had picked up his girlfriend

was free to go. They all remained at the gas station until 8 a.m. At this time, officers noticed that one of the girls with the defendant had work gloves in her purse which were identical to those sold in the Tulsa station. Also, another similar glove was found on the floor of the car in which defendant rode. While the defendant was at the gas station, the sheriff's department towed the car in which defendant had ridden to the police station for having improper plates. Lister then offered the defendant and his friends a ride to the police station so they could make a telephone call in order to get a ride home.

Prior to defendant's arrival at the gas station, a tracking dog had led officers from the gas station to a parking lot located near the station where fresh tire tracks and footprints were observed in the snow. Some oil spots or drippings were also observed in the snow. After defendant and his friends arrived in their car, the officers noticed similarities between the car's tire tracks and oil drippings and those previously observed in the snow at the parking lot.

While at the police station, Lister asked Stella Kowalski and Debbie McLaughlin some questions. At or about 9 or 9:30 a.m., Lister told the individuals they could go. They told Lister that they were going to a nearby restaurant. At no time did the officer tell defendant he was under arrest.

After defendant and his friends left, Detective Lister spoke with the chief assistant prosecutor for

---

(Debbie McLaughlin) at midnight from Knapp's Restaurant. They drove to her home in Utica which she shared with the Kowalskis and went to bed. Sands indicated that he had slept until about 3 a.m., when he woke up for a cigarette and then went back to sleep and finally awoke about 6 a.m. on the day that the bodies were found. The codefendant awakened him to have breakfast and all four went to the Flame Restaurant in the codefendant's car because the defendant's car was broken down.

Oakland County. Following this conversation, Lister requested that Officer Mercer go to the restaurant where defendant and Kowalski had said they were going and bring them back for further questioning. Officer Mercer went to the restaurant and told Kowalski and Sands that Detective Lister would like to talk with them. Officer Mercer testified that as far as he was concerned, defendant had a choice in deciding whether or not to go to the police station and that defendant voluntarily went with him.

When defendant and Kowalski arrived at the police station, they were ushered into a report writing room and asked to have a seat until Detective Lister returned. The officer told them that there was coffee in the back, as well as a restroom. Officer Mercer then left the police station. Apparently there was no one, other than Kowalski, defendant and the dispatcher, at the police station at this time.

Detective Lister returned to the police station around 11:30 or 12 o'clock. Detective Lister testified that he advised defendant of his rights and questioned him. Lister also testified that defendant "wasn't officially arrested", but "was being held for questioning". "He wasn't free to leave. He was there for interrogation purposes."

At 1:45 p.m., defendant gave a statement in the presence of the chief assistant prosecutor, Detective Lister and a court reporter. Prior to giving this statement, defendant was advised of his *Miranda*[3] rights. The defendant denied involvement in the crime and he was then taken back to the room where he had been waiting. During the next 45 minutes to an hour, the codefendant Kowalski

---

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

and Kowalski's sister were questioned. During this 45-minute period, the defendant agreed to submit to a nitrate test. However, the nitrate test was never sent in for analysis because the test was conducted too long after the crime for the results to be reliable.

After the questioning of Kowalski and Kowalski's sister, defendant indicated that he wanted to see the chief assistant prosecutor. At 3:05 p.m., the chief assistant prosecutor took the defendant's 25-minute stenographically recorded confession. Lister and the Pontiac Township police chief, Robert Rayner, were also present.

Defendant in his confession detailed the planning of the robbery and the intent to kill the attendants after getting the money. Defendant explained how he and Kowalski parked in the cement company's parking lot and approached the station carrying an 8mm lever action sniper rifle. After getting the money, he stated how he ordered the victims into the bathroom and repeatedly shot them as they tried to talk him out of it. Defendant said he shot the victims because he had worked with them before and they could identify him. The defendant presented no witnesses on his behalf at the trial.

At the trial of this cause, testimony was introduced that the bodies of the two attendants were found by a customer around 6 a.m. The victims were found lying on the floor of the men's bathroom with the top of their heads "blown off". A witness who lived directly across from the gas station testified that she had heard 3 distinct sounds, similar to small explosions, around 6 a.m. on November 30.

Debra McLaughlin, the girl with whom defendant was living at the time, testified that about 4 or

5 a.m., on the morning in question, defendant left their home in the company of Kowalski. She testified that defendant left the house carrying a rifle. Ms. McLaughlin further stated that defendant and Kowalski returned around 6 a.m. and told her to go into another room while they carried on a conversation. Shortly thereafter, before leaving for a nearby restaurant, defendant told her that he had $900 in the attic if she needed any money.

An audit of the Tulsa gas station disclosed that $1,275.81 including checks was missing from the safe. Deputy Donald McLaughlin, employed by the Oakland County Sheriff's Department Crime Laboratory, testified that he found a metal jacket of a fired bullet on the floor of the gas station. Pursuant to a search warrant, he found four fired UMC 8mm Lebel cartridge cases in the living room of Ms. McLaughlin's home. Also, an 8mm Lebel caliber rifle was found in the closet. As a ballistics expert, he testified that the shell casing found at the gas station had been fired from the rifle found in the closet. Also found pursuant to the search warrant was $872 in plastic sandwich bags located in the rafters above a trap door in the bedroom. Also, the victims' payroll checks, along with other checks from the Tulsa station, were discovered under a blanket in the same bedroom.

Apparently, sometime during the questioning of the defendant at the police station, his shoes were taken from him to see whether or not they would match the footprints found in the snow near the crime scene. A police officer testified that the shoes had the same size and pattern as the footprints in question.

The defendant was not placed under arrest on the day in question until around 4 or 5 p.m.

The defendant first raises two procedural issues, neither of which merits a reversal or remand.

The main issue defendant raises on appeal is whether the defendant's confession should have been suppressed as the fruit of the poisonous tree. Defendant asserts that since he was arrested without a warrant and without probable cause, his confession was therefore illegal and inadmissible in evidence as the fruit of a poisonous tree.

In order to analyze this issue, we must first determine if and when the defendant was arrested.

A definition of an arrest was made in *People v Gonzales,* 356 Mich 247, 253; 97 NW2d 16 (1959), wherein the Court, quoting from 4 Am Jur, Arrest, § 2, stated as follows:

" 'An arrest is the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest. The act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested.' "

See also, *Dixon v Shiner,* 12 Mich App 573, 582; 163 NW2d 481 (1968).

Applying this definition to the instant case, we find that defendant was not under arrest until his questioning in the afternoon on November 30, 1974. A review of the facts supports this view.

When the defendant gave his first statement at 1:47 p.m., the facts indicate that he was under arrest at this time. Detective Lister admitted that although defendant was not officially under arrest at the time of his statement, he was not free to leave. Additionally, his shoes were removed from him and a nitrate test was administered to his

hands. These facts indicate that the defendant was under arrest as defined by *Gonzales*.

In order to determine whether or not the defendant's arrest at this time was legal, we must determine whether or not there was probable cause for his arrest. *People v Wolfe*, 5 Mich App 543, 552; 147 NW2d 447 (1967). Our review of the facts indicates that there were sufficient facts known to justify a finding of probable cause at this time. Thus, the arrest was valid and the confession of defendant was not the fruit of the poisonous tree. Therefore, the trial judge properly admitted the confession in evidence.

We feel the following facts were sufficient to establish probable cause. The oil stains and tire tracks at the scene of the crime matched those of the car in which defendant was riding. Also, officers observed a work glove in the car in which defendant was riding and a pair of work gloves were seen in the purse of one of the women who accompanied defendant. These work gloves were identical to the work gloves that were sold at the gas station. The defendant was observed shortly after the crime was committed at a restaurant within ten minutes from the scene of the crime. Additionally, the police knew that the defendant had previously worked at the station and two weeks prior had taken $1,400 from the station for which he had lost his job.

The trial judge held at the evidentiary hearing as follows:

"Thank you gentlemen, for a very thorough treatment of this somewhat gray area. Let me say, first of all, that I do not find an illegal arrest here, under all of the attendant circumstances that have been presented, and analyzing the hours and moments surrounding

preceding the giving of the statement that occurred with regard to these two respondents."

The ruling of the trial judge was not clearly erroneous and is upheld by this Court.

We have ruled that the arrest was legal and proper and that defendant's confession was properly admitted. We find that the trial judge committed no error.

Next, defendant asserts that the admission of the testimony relating to the use of the police tracking dog was reversible error. The defendant does not challenge the Michigan rule that tracking dog evidence is admissible. *People v Harper,* 43 Mich App 500, 508; 204 NW2d 263 (1972), *lv den,* 389 Mich 759 (1973), *People v Norwood,* 70 Mich App 53, 55; 245 NW2d 170 (1976). Instead, the defendant maintains that the foundation laid by the prosecutor was improper.

Before tracking-dog evidence is admissible, the prosecution must establish four conditions which provide a proper foundation. The conditions are:

"(1) [T]he handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and, (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it." *Harper, supra,* at 508.

Also see, *Norwood, supra,* at 55.

The people admit that not all the foundational requirements were met in the instant case, however, the people assert that this does not require reversal of defendant's conviction. We agree. Defendant made no objection at trial or thereafter until appeal, and absent a showing of manifest

injustice, specific objection to the admission of evidence cannot be raised for the first time on appeal. *People v Alexander,* 72 Mich App 91, 99; 249 NW2d 307 (1976). We find no manifest injustice. The evidence against the defendant was overwhelming and the admission of the testimony regarding the tracking dog could not have aided an otherwise undecided juror on the issue of defendant's guilt beyond a reasonable doubt. *People v Swan,* 56 Mich App 22, 33; 223 NW2d 346 (1974).

Affirmed.