PEOPLE v ULRICH
PEOPLE v HARGER

Docket Nos. 30336, 30337. Submitted February 14, 1978, at Lansing.—
Decided May 8, 1978.

Dale A. Ulrich and Richard D. Harger were convicted of armed
robbery, Cheboygan Circuit Court, Philip J. Glennie, J. Defend-
ants appeal. *Held:*

1. The stopping of the vehicle in which the defendants were
riding was proper because the vehicle had a defective license
plate light and because the sheriff's deputies had reasonable
cause to make an investigative stop in connection with the
armed robbery based on specific facts available to the deputies
giving them a reasonable belief that criminal activity might be
afoot. Subsequent to stopping the defendant's vehicle, the pre-
cautionary measures taken by the deputies, approaching the
vehicle with shotguns and asking the subjects to exit and
conducting a pat-down search with the subjects off balance,
were reasonable in light of the circumstance known to the
deputies and did not constitute an illegal arrest but rather a
proper investigatory detention, and the trial court committed
no clear error in refusing to suppress the evidence obtained.

2. Any violation of the defendants' right to remain silent by
the prosecution's questions at the bench trial asking two wit-
nesses if the defendants had made any statements after receiv-
ing their *Miranda* warnings was harmless error beyond a
reasonable doubt.

Affirmed.

1. CRIMINAL LAW—EVIDENCE—MOTION TO SUPPRESS—APPEAL AND ER-
ROR—CLEARLY ERRONEOUS.

The Court of Appeals will not reverse a trial court's ruling on a

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error § 602.
[2] 5 Am Jur 2d, Arrest § 45.
[3] 5 Am Jur 2d, Arrest § 1.
[4] 68 Am Jur 2d, Searches and Seizures §§ 2, 5.
[5] 21 Am Jur 2d, Criminal Law §§ 349, 351–353.
[6] 5 Am Jur 2d, Appeal and Error §§ 778, 779, 798, 801, 802.
   21 Am Jur 2d, Criminal Law § 353.

motion to suppress evidence unless that ruling is found to be clearly erroneous.

2. CRIMINAL LAW—ARREST—STOP OF SUSPICIOUS INDIVIDUALS—REASONABLENESS—FACTS KNOWN TO POLICE OFFICERS.

A police officer's brief stop of a suspicious individual in order to determine the individual's identity or to maintain the status quo momentarily while obtaining more information may be most reasonable in light of the facts known to the officer at the time; however, specific articulable facts must be known to the officer at the time of the intrusion which would warrant a man of reasonable caution in believing that the action taken was appropriate.

3. ARREST—DEFINITIONS—WORDS AND PHRASES.

An arrest is the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest; the act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested.

4. CONSTITUTIONAL LAW—CRIMINAL LAW—INVASION OF RIGHTS—REASONABLENESS—PUBLIC INTEREST—PERSONAL SECURITY.

The touchstone of an analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security"; reasonableness depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers (US Const, Am IV).

5. CONSTITUTIONAL LAW—CRIMINAL LAW—RIGHT TO REMAIN SILENT—NONUTTERANCES—STATEMENTS—WITNESSES.

Conduct which directly or indirectly restricts the exercise of the constitutional right to remain silent in the face of accusation will not be condoned; "nonutterances" are not statements and the fact that a witness did not make a statement may be shown only to contradict his assertion that he did.

6. CRIMINAL LAW—RIGHT TO REMAIN SILENT—CONSTITUTIONAL LAW—STATEMENTS—HARMLESS ERROR.

Allowing two unobjected-to questions and answers in a bench trial as to whether or not the criminal defendants had made any statements to police officers after the defendants had been arrested and given their *Miranda* warnings violated the defend-

ant's right to remain silent, but such error was harmless beyond a reasonable doubt and played no part in the ultimate verdict where the questions and answers were very brief and the evidence of guilt was clear and overwhelming.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Michael J. Hackett,* Prosecuting Attorney (Prosecuting Attorneys Appellate Service, *Keith D. Roberts,* Assistant Attorney General, of counsel), for the people.

*Terence R. Flanagan,* Assistant State Appellate Defender, for defendant on appeal.

Before: DANHOF, C. J., and BRONSON and N. J. LAMBROS,* JJ.

N. J. LAMBROS, J. On June 23, 1976, defendants were convicted of armed robbery in violation of MCL 750.529; MSA 28.797 following a joint bench trial. Subsequently both defendants were sentenced to terms of 5 to 15 years in prison. Both defendants appeal as of right raising the same two issues.

I

Defendants first contend that much of the evidence presented against them at trial should have been suppressed because it was obtained as a result of an illegal arrest. Resolution of this issue requires us to look at the information known to the lower court at the time it denied defendants' motion to suppress. This Court will not reverse a trial court's ruling on a suppression motion unless that ruling is found to be clearly erroneous. *People v Terrell,* 77 Mich App 676, 679; 259 NW2d 187 (1977). Shortly after midnight on January 20,

---

* Circuit judge, sitting on the Court of Appeals by assignment.

1976, defendants, wearing ski masks and armed with guns, entered and robbed a bar in Wolverine, Michigan. They made their getaway from the scene in a pickup truck driven by a third person. The robbery was reported and a police radio bulletin was issued. This bulletin was picked up at the Otsego County Sheriff's Office in Gaylord, Michigan, at approximately 12:40 a.m. Two sheriff's deputies, who had finished working the 4 p.m. to midnight shift, were present and, at the request of the midnight shift desk sergeant, set out to check a possible escape route by driving north on Highway 27. In evaluating the actions of these two deputies, we must look at the specific articulable facts known to the deputies at the time they acted. See *People v Wade,* 23 Mich App 132, 135; 178 NW2d 139 (1970), and *People v Hunter,* 72 Mich App 191, 197; 249 NW2d 351 (1976). The deputies testified, prior to the suppression ruling, that the radio broadcast stated that there had been an armed robbery at a bar in Wolverine, Michigan, at approximately 12:30 a.m. involving two subjects who were possibly headed south. One of the two subjects had worn a ski mask and the other possibly a nylon type covering over his face during the robbery. A yellow or gold money bag was reported taken. No mention of a vehicle was made in the broadcast. The two deputies traveled north on Highway 27 in a fully marked patrol vehicle equipped with two spotlights and red and blue overhead revolving lights. One deputy testified that snow had been falling off and on and most county roads were slippery that night, the temperature was cold and from ten until midnight the road traffic had gone from "nothing to nil". After traveling for three to three-and-one-half miles, the deputies encountered a pickup truck headed south with three occupants. At this point the pickup

truck was approximately 20 miles from the robbery scene and approximately 20 minutes had elapsed since the robbery, the pickup was swaying as it traveled, and slowed down after passing the patrol car. The patrol car turned around and pursued the truck at a speed under the speed limit. The deputies observed that one taillight was "out" and that there was no license plate light operating on the pickup truck. The patrol car overhead flashers were activated and the pickup truck stopped after traveling an additional one-quarter to one-half mile. While following the pickup, the deputies observed that the center passenger kept peering out the back window and looking around while the other passenger was "doing a lot of movement". One deputy stated that the pickup took longer than normal to stop and that the outside passenger bent over a little bit in the seat as if possibly he might have been storing something away.

After the pickup truck was stopped at approximately 12:50 a.m., the deputies, armed with shotguns, approached it from the rear and asked the occupants to exit the passenger side door. Two passengers did so, however, the driver whose window was rolled down exited on the driver's side. As the two passengers exited, an object, *later* found to be a ski mask, fell from the truck to the ground. All three subjects were ordered to the rear of the truck, "spread eagled" against the back of the truck and patted down. This pat down resulted in the discovery of a ski mask with panty hose in it, and a bank deposit money bag. Subsequently, the ski mask that had fallen out of the truck was retrieved and identified, and upon shining a flashlight into the open passenger side door opening of the pickup cab, two sawed-off shotguns were dis-

covered and retrieved. At this point the subjects were told that they were under arrest.

The initial stop of the pickup was proper, and the deputies did have sufficient probable cause to arrest the defendants at the time the "formal" arrest was made. Defendants argue, however, that "the warrantless arrest here occurred at the moment that the officers ordered defendants out of their vehicle at gunpoint" and that at that point the officers did not have probable cause to believe the defendants had committed a felony. Consequently, defendants argue that this arrest was illegal and all of the resulting evidence should have been suppressed. While it is a very close question, we agree that the deputies did not have probable cause to arrest at the time they asked the defendants to exit their truck. Compare, *People v Scott,* 23 Mich App 568, 570; 179 NW2d 255 (1970), *People v Beauregard,* 21 Mich App 224; 175 NW2d 301 (1970), *People v Knight,* 41 Mich App 293, 294; 199 NW2d 861 (1972), and *People v Obadele,* 58 Mich App 139; 227 NW2d 258 (1975).

In support of their argument defendants cite *People v Gonzales,* 356 Mich 247, 253; 97 NW2d 16 (1959), where the Court cited 4 Am Jur, Arrest, § 2:

"American Jurisprudence defines 'arrest' in these terms:

" 'An arrest is the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest. The act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested.' 4 Am Jur, Arrest, § 2."

In some cases it may be analytically helpful to determine the precise point at which an arrest occurs. See for example, *People v Sands,* 82 Mich App 25; 266 NW2d 652 (1978). Compare, *People v Harris,* 43 Mich App 531, 538–541; 204 NW2d 549 (1972). In some cases, however, merely labeling certain conduct as an arrest or nonarrest will produce an unsatisfactorily arbitrary result. Regardless of when the "arrest" occurred, there was a seizure of the defendants within the meaning and protection of the Fourth Amendment at the time the defendants were asked to exit their vehicle. The initial stop of the vehicle was proper both because of the defective license plate light, see *People v Edwards,* 73 Mich App 579, 587; 252 NW2d 522 (1977), and because the deputies had reasonable cause to make an investigative stop in connection with the armed robbery, see *People v Kirchoff,* 74 Mich App 641, 644–645; 254 NW2d 793 (1977), based on the following specific and articulable facts available to the deputies giving them a reasonable belief that criminal activity might be afoot, see *People v Lillis,* 64 Mich App 64, 70; 235 NW2d 65 (1975). The pickup truck was headed rapidly away from the crime scene on a possible escape route, at a very late hour, in poor weather, and extremely light traffic, swaying down the highway at a time and place where an escape vehicle could logically be expected to be found. In addition, the truck had three occupants when two persons had perpetrated the crime, and the pickup had slowed down upon passing the patrol car, one passenger repeatedly looking out the rear window at the officers.

The next and decisive question is the propriety of the deputies' actions after the pickup was stopped. See, *Commonwealth of Pennsylvania v*

*Mimms,* 434 US 106; 98 S Ct 330; 54 L Ed 2d 331 (1977). Citing *People v Whalen,* 390 Mich 672; 213 NW2d 116 (1973), *Adams v Williams,* 407 US 143; 92 S Ct 1921; 32 L Ed 2d 612 (1972), *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), and *United States v Brignoni-Ponce,* 422 US 873; 95 S Ct 2574; 45 L Ed 2d 607 (1975), the defendants contend that such an investigatory stop must be conducted in an "appropriate manner". We agree, but note that what is appropriate in one context may not be appropriate in another context. The rule to be applied was set out in *Mimms, supra:*

> "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' Terry v Ohio, 392 US 1, 19 (1968). Reasonableness, of course, depends 'on a balance between the public interest, and the individual's right to personal security free from arbitrary interference by law officers.' United States v Brignoni-Ponce, 422 US 873, 878 (1975)." 434 US at 108–109; 98 S Ct at 332; 54 L Ed 2d at 335–336.

In the instant case the two deputies had reason to suspect that the three occupants of the pickup truck were armed and in the process of fleeing the scene of a felony. We believe that the precautionary measures taken, approaching the pickup with shotguns and asking the subjects to exit the truck and conducting a pat-down search with the subjects off balance were reasonable in these circumstances. In light of all the circumstances known to the deputies at the time, they did act in an "appropriate manner,"[1] which therefore did not consti-

---

[1] *Compare People v Johnson,* 81 Mich App 70; 264 NW2d 125 (1978), holding that a coercive intrusion into a home on less than probable cause was unreasonable, in light of *People v Whalen,* 390 Mich 672, 682; 213 NW2d 116 (1973):

"Fewer foundation facts are necessary to support a finding of

tute an illegal arrest but rather a proper investigatory detention and the trial court committed no clear error in refusing to suppress the resulting evidence.

## II

Defendants also assert that reversible error occurred when the prosecution elicited testimony from the arresting officer that both defendants chose to remain silent after *Miranda* warnings were given. The questions and answers involved were:

"Q Did the suspects make any statements to you?
"A No, sir.

*   *   *

"Q Were any statements made to you on the way to the Otsego County Sheriff's Department after the Miranda Warnings were read?
"A No, sir."

In *People v Bobo,* 390 Mich 355, 359; 212 NW2d 190 (1973), the Court stated:

"We will not condone conduct which directly or indirectly restricts the exercise of the constitutional right to remain silent in the face of accusation. 'Nonutterances' are not statements. The fact that a witness did not make a statement may be shown only to contradict his assertion that he did."

In *People v Swan,* 56 Mich App 22, 26–35; 223 NW2d 346 (1974), *Bobo* error was found to be harmless but the Court stated:

reasonableness when moving vehicles are involved, than if a house or a home were involved."

"In finding the error harmless in this case, we wish to emphasize that we do not condone conduct which directly or indirectly restricts or penalizes the exercise of the constitutional right to remain silent in the face of accusation. *People v Bobo,* 390 Mich 355; 212 NW2d 190 (1973). We will find it difficult in the future to believe that prosecutors and police are ignorant of the well-established principle of law which forbids ·comment upon an accused's silence or that clear violations of the principle arise from inadvertence. Deliberate violations of this rule may lead us to reverse convictions even where evidence might be overwhelming. The prosecutor who comments, or elicits comment, on a defendant's silence thus risks the loss of a perfectly good case for no reason." *People v Swan, supra,* at 35.

In *People v Patricia Williams,* 63 Mich App 531; 234 NW2d 689 (1975), this Court held that a combination of *Bobo* error and the improper introduction of an arrest record was so offensive to the maintenance of a sound judicial process that the Court declined to reach the harmless error question. In *People v Hargrave,* 74 Mich App 690; 254 NW2d 614 (1977), this Court went beyond *People v Patricia Williams* in holding that *Bobo* error by itself "under the circumstances of this case" was so offensive to the maintenance of a sound judicial process that the harmless error issue would not be considered. See also *People v Norris,* 74 Mich App 361; 253 NW2d 767 (1977), and cases cited therein. Compare *People v Christopher Johnson,* 72 Mich App 172; 249 NW2d 343 (1976).

Unlike *People v Hargrave, supra,* the error in allowing the two unobjected to questions and answers in this *bench* trial was not so offensive to the maintenance of a sound judicial process that it could never be regarded as harmless. Therefore, we must ask whether the error was harmless

beyond a reasonable doubt. *People v Mobley*, 390 Mich 57, 65; 210 NW2d 327 (1973). In light of the brevity of the questions and answers and the clear and overwhelming evidence of guilt, we believe the *Bobo* error in this case was harmless beyond a reasonable doubt, and played no part in the ultimate verdict.

Affirmed.