PEOPLE v SUMMERS

*Docket No. 58465. Argued October 5, 1978 (Calendar No. 10).—Decided December 27, 1979.*

George Summers was the owner of a house in Detroit which police officers searched under a warrant for heroin, other narcotics, and paraphernalia. He was leaving the premises as the search party arrived; he was stopped for questioning by the officers on the front porch and was then taken into the house and detained as the search warrant was executed. The police officers found two plastic bags of substances which they suspected to be narcotics in the basement of the house. Seven other persons, who were in the house, were detained during the search and one was arrested after attempting to discard sus-

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Arrest §§ 24, 25.
[2] 5 Am Jur 2d, Arrest § 2.
  68 Am Jur 2d, Searches and Seizures §§ 8, 12.
[3] 5 Am Jur 2d, Arrest §§ 2, 24, 25.
  68 Am Jur 2d, Searches and Seizures §§ 41-44.
[4] 68 Am Jur 2d, Searches and Seizures §§ 33, 58, 103.
[5] 68 Am Jur 2d, Searches and Seizures §§ 16, 41-44.
[6] 29 Am Jur 2d, Evidence § 415.
Modern rule governing admissibility of evidence obtained by unlawful search and seizure. 50 ALR2d 531.
Federal Constitution as affecting admissibility of evidence obtained by illegal search and seizure. 84 ALR2d 959.
Violation of federal constitutional rule (Mapp v Ohio) excluding evidence obtained through unreasonable search and seizure, as constituting reversible or harmless error. 30 ALR3d 128.
"Fruit of poisonous tree" doctrine excluding evidence derived from information gained in illegal search: comment note. 43 ALR3d 385.
[7] 5 Am Jur 2d, Arrest § 2.
  68 Am Jur 2d, Searches and Seizures §§ 2, 8.
[8] 5 Am Jur 2d, Arrest § 2.
  68 Am Jur 2d, Searches and Seizures § 2.
[9, 11-15] 5 Am Jur 2d, Arrest § 44.
  68 Am Jur 2d, Searches and Seizures §§ 41-44.
[10] 5 Am Jur 2d, Arrest § 2.
  68 Am Jur 2d, Searches and Seizures §§ 41-44.

pected narcotics. Summers was formally arrested after the officers determined that he owned the house they had searched; they found a plastic bag containing a substance which they suspected to be heroin in the defendant's pocket, and charged him with possession. The Recorder's Court of Detroit, Robert J. Colombo, J., granted the defendant's motion to suppress the heroin found in his pocket as being the result of an illegal search and seizure, and quashed the information. The Court of Appeals, Bronson, P.J., and M. F. Cavanagh, J. (Bashara, J., dissenting), affirmed (Docket No. 22802). The people appeal. In an opinion by Justice Blair Moody, Jr., joined by Justices Kavanagh, Levin, and Ryan, the Supreme Court *held:*

1. A police officer has statutory authority to arrest without a warrant when he has reasonable cause to believe that a felony has been committed and reasonable cause to believe that the person arrested has committed it. Probable cause for an arrest without a warrant has been defined as any facts which would induce a fair-minded person of average intelligence and judgment to believe that the suspected person has committed a felony. The facts upon which such belief is based must be present at the moment of arrest, and therefore each case must be analyzed in light of the particular facts confronting the arresting officer.

2. In this case the defendant had left the house before the search party arrived and was proceeding down the front porch steps when he was approached by an officer who detained him for the purpose of limited inquiry and ascertained that he lived there. There is no evidence that he was frisked. His behavior pursuant to the officers' request for admittance was cooperative. The testimony at the preliminary examination indicates that he was not free to leave the front porch as the search warrant for the premises was being executed, but was escorted into his house and deprived of his liberty. At that time the initial inquiry and cooperative response terminated. The further detention of the defendant, by bringing him into the house, was a "seizure" as defined by the Supreme Court of the United States, and because it was unsupported by probable cause, violated the Fourth Amendment.

3. The general standard for determining whether a seizure-detention by a police officer is legal is not whether the police officer's actions were reasonable under the circumstances but, rather, whether the police officer had probable cause to arrest. The narrow exceptions allow police intrusion restricted to brief questioning regarding suspicious activity and to limited weapons frisks necessary to insure safety. The defendant's conduct

at no time gave a basis for the officers to suspect unlawful activity on his part or to fear for their safety. The initial stop and brief questioning of the defendant was completed, and at that point the officers had exhausted any limited basis to restrain him further. When the defendant's liberty was thereafter restrained, the police officers must have had probable cause to arrest the defendant to render the seizure-detention reasonable under the Fourth Amendment. The defendant was, for all practical purposes, placed under arrest when he was "seized" on the front porch, before the house was searched, when the police officers did not have probable cause to believe that the defendant had committed or was committing a felony. The heroin seized from the defendant, constituting the fruits of the unlawful arrest, must be excluded from evidence.

The order of the trial court is affirmed.

Justice Williams, joined by Chief Justice Coleman and Justice Fitzgerald, dissented. He wrote:

1. There can be no question that the police "seized" the defendant when they required him to go back inside his house and remain there during the execution of the search warrant, *i.e.,* before they had probable cause to arrest him. However, that determination does not end the inquiry into the constitutionality of the police action in question. Just as the Supreme Court of the United States has rejected the notion that the Fourth Amendment is not a limitation upon police conduct which may stop short of being a "technical arrest", it is also erroneous to label a "seizure" of a defendant uncritically an arrest, and to characterize it as "illegal" because it was made without probable cause. Rather, the question is whether the "seizure" of the defendant, under the circumstances of this case, violated the state and Federal constitutional proscriptions against *unreasonable* seizures.

2. The Supreme Court of the United States has defined a special category of "seizures" of defendants, or detentions, which are so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures" reasonable could be replaced by a balancing test. Close analysis of the decisions of the Supreme Court of the United States suggests that basically there are four criteria to be considered in balancing to determine reasonableness: first, whether the police action was taken in an atmosphere requiring rapid reaction to the exigencies encountered in the field, or was the result of a deliberate, planned decision; second, whether the police officer's belief in the necessity for action to protect the public peace and safety was justified at its incep-

tion; third, whether the intrusion on the person's privacy by the police was reasonably related in scope to the circumstances which justified the interference in the first place; fourth, whether the "seizure" of the defendant was reasonable to protect the officers' safety.

3. In justifying a particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, meet the test of reasonableness. These facts are to be subjected to the neutral scrutiny of a judge who must evaluate the reasonableness of the particular search or seizure in light of the circumstances. It is imperative that the facts be judged against an objective standard, whether the facts available to the officer at the moment of the seizure would warrant a person of reasonable caution in the belief that the action taken was appropriate. In judging the reasonableness of the actions of the police officer the circumstances are not to be dissected and viewed singly; rather they must be considered as a whole. So considered, they are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by the officer's experience and training.

4. In this case, confronted with the possibility that an inhabitant of a house where trafficking in drugs was allegedly conducted might escape to summon aid or interfere with the execution of the warrant, a police officer made a quick on-the-spot decision that the safety of the police officers could be best protected by bringing the defendant inside and keeping him under surveillance with the other occupants of the house. The search warrant indicated that the premises they were about to search had been a place of drug traffic only one day earlier. The abrupt slamming of the door in the police officer's face when he identified himself as a police officer reasonably confirmed the likelihood that illegal activities were being carried on in the premises. Furthermore, there was a reasonable nexus between the defendant and the premises: the defendant had just left the house and had admitted that he lived there, and his communication with people inside the house indicated a relationship. The need for prudent and comprehensive action, because the main object of the search warrant was heroin, a white powder which can be easily secreted or destroyed, justified detaining the defendant. Further, it is a recognized fact that armed violence not infrequently accompanies the use of or traffic in narcotics, a fact which is well known to the police. Merely requiring the defendant to cross his own threshold while the search warrant was being executed was a narrow

intrusion designed to ensure the police officers' safety. It did not go beyond the kind of intrusion justified by the attendant concern for safety. A law enforcement officer, when engaged in the performance of duty, must act on a quick appraisal of the facts without the benefit of the hindsight which is usually possessed by those reviewing such actions. On balance, the important state interest in the police officers' safety outweighed this relatively minor intrusion into the defendant's personal liberty. The police in this case could have reasonably feared for their safety had they allowed the defendant to remain at large outside the house while they were occupied within in the search warrant's execution. The four criteria of the balancing test are satisfied by the facts in this case; the bringing of the defendant into his house was reasonable and therefore constitutionally permissible.

5. The next issue is whether it was reasonable to keep the defendant in his house while the search was being conducted. No Michigan case specifically addresses the question, but other courts have held that it is lawful for police officers, during the execution of a search warrant, to detain all persons found on the premises described in the warrant. If persons are left free to roam about the premises while the warrant is being executed, they could well destroy or carry off objects of the search. Indeed, the United States Court of Appeals for the First Circuit has treated a challenge to such a forcible detention during the execution of a search warrant as "clearly frivolous". Also, the rationale of the safety of the police officers which justified bringing the defendant inside his house in the first place would continue to apply to his detention and surveillance once he was inside.

6. A police officer generally has probable cause to arrest, without a warrant, the known and present owner-occupant of premises wherein suspected narcotics are discovered pursuant to a valid search warrant for the premises. Probable cause to believe that a particular person has committed a particular offense is not the equivalent of guilt beyond a reasonable doubt. Therefore the formal arrest of the defendant inside his house following the discovery of suspected narcotics in his basement was constitutionally valid because it was based on probable cause.

68 Mich App 571; 243 NW2d 689 (1976) affirmed.

OPINION OF THE COURT

1. ARREST — PROBABLE CAUSE — APPEAL AND ERROR.
    A court, in reviewing a claim that a police officer lacked probable

cause to arrest without a warrant, must determine whether facts available to the officer at the moment of arrest would justify a fair-minded person of average intelligence to believe that the suspected person had committed a felony; each case must be analyzed in light of the particular facts confronting the arresting officer (MCL 764.15; MSA 28.874).

2. ARREST — SEARCHES AND SEIZURES — WORDS AND PHRASES.

Not all personal intercourse between policemen and citizens involves "seizures" of persons; only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

3. ARREST — SEARCHES AND SEIZURES — PROBABLE CAUSE.

The standard for determining whether a seizure-detention of a citizen by a police officer violates the Fourth Amendment is not whether the police officer's actions were reasonable under the circumstances but, rather, whether the police officer had probable cause to arrest (US Const, Am IV).

4. SEARCHES AND SEIZURES — STOP AND FRISK — WEAPONS — PROBABLE CAUSE.

Intrusions by police officers permissible under a "stop and frisk" exception to the Fourth Amendment probable cause requirement, as defined by the Supreme Court of the United States, are restricted to brief questioning regarding suspicious activity, and to the limited "frisks" for weapons necessary to insure the safety of the officers; the exception did not apply where a defendant who was stopped and questioned by police officers in front of his home answered the inquiries and attempted to assist the officers to gain entrance to the premises, and where the defendant's conduct at no time gave a basis for the police officers to suspect unlawful activity on the defendant's part or to fear for their safety (US Const, Am IV).

5. ARREST — SEARCHES AND SEIZURES — PROBABLE CAUSE — DRUGS AND NARCOTICS — POSSESSION.

Detention of a defendant who was the owner of a house which was being searched for narcotics under a search warrant was unreasonable and constituted a "seizure" of him unsupported by probable cause and violated the Fourth Amendment where the record shows that the defendant had left the house before the search party arrived and was discovered by police as he was going down the steps of his front porch, that he was not free to leave his front porch as the search warrant was being

executed, but was escorted into his house and deprived of his liberty, and that he was deprived of his liberty before the search of the premises produced the heroin which was claimed to give the police probable cause for the defendant's arrest (US Const, Am IV).

6. ARREST — SEARCHES AND SEIZURES — PROBABLE CAUSE — DRUGS AND NARCOTICS — EVIDENCE — ADMISSIBILITY.

Heroin which was seized from a defendant who had been, for all practical purposes, placed under arrest when he was "seized", or detained, by police on the front porch of his house which was about to be searched for narcotics pursuant to a search warrant, when the police officers did not have probable cause to believe that the defendant had committed or was committing a felony, constituted the fruits of an unlawful arrest of the defendant, and must be excluded from evidence (US Const, Am IV).

DISSENTING OPINION BY WILLIAMS, J.

7. SEARCHES AND SEIZURES — ARREST — WORDS AND PHRASES.

*The Fourth Amendment may act as a limitation upon police conduct in "seizing" a person even though a police officer stops short of "technically arresting" him (US Const, Am IV; Const 1963, art 1, § 11).*

8. SEARCHES AND SEIZURES — ARREST — WORDS AND PHRASES — REASONABLENESS.

*It would be erroneous to label uncritically a "seizure" of a defendant by police as being an "arrest" and then to characterize it as illegal because it was made without probable cause; rather, the question is whether the seizure of the defendant, under the circumstances of the case, violated the state and Federal constitutional proscriptions against unreasonable seizures (US Const, Am IV; Const 1963, art 1, § 11).*

9. SEARCHES AND SEIZURES — ARREST — WORDS AND PHRASES — REASONABLENESS.

*The Supreme Court of the United States has defined a special category of "seizures" of defendants, or detentions, which are so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures" reasonable can be replaced by a balancing test (US Const, Am IV; Const 1963, art 1, § 11).*

10. SEARCHES AND SEIZURES — REASONABLENESS.

The key principle of the Fourth Amendment is reasonableness, the balancing of competing interests (US Const, Am IV; Const 1963, art 1, § 11).

11. SEARCHES AND SEIZURES — ARREST — REASONABLENESS.

There are four criteria to be considered in balancing to determine the reasonableness of police action in "seizing" a defendant, within the meaning of the Fourth Amendment: 1) whether the police action was taken in an atmosphere requiring rapid reaction to the exigencies encountered in the field, 2) whether the police officer's belief in the necessity for action to protect the public peace and safety was justified at its inception, 3) whether the intrusion on the person's privacy by the police was reasonably related in scope to the circumstances which justified the interference in the first place, 4) whether the "seizure" was reasonable in order to protect the police officers' safety (US Const, Am IV; Const 1963, art 1, § 11).

12. SEARCHES AND SEIZURES — ARREST — REASONABLENESS.

A police officer, in justifying a particular intrusion upon Fourth Amendment rights, must be able to point to specific and articulable facts which, taken together with rational inferences from the facts, meet the test of reasonableness; a judge who is reviewing these facts must evaluate their reasonableness against an objective standard, whether the facts available to the police officer at the moment of the seizure would warrant a person of reasonable caution in the belief that the action taken was appropriate (US Const, Am IV; Const 1963, art 1, § 11).

13. SEARCHES AND SEIZURES — REASONABLENESS.

In judging the reasonableness of actions of a police officer conducting a search and seizure, the circumstances are not to be dissected and viewed singly, but must be considered as a whole, viewed through the eyes of a reasonable and cautious police officer on the scene, guided by the officer's experience and training (US Const, Am IV; Const 1963, art 1, § 11).

14. SEARCHES AND SEIZURES — DRUGS AND NARCOTICS — ARREST — OWNER OF PREMISES — REASONABLENESS.

It was reasonable for police officers, who were executing a search warrant for narcotics in a certain house, to take inside the house a defendant who was the owner of it and who was on the porch of the house when the police officers arrived where the police were confronted with the possibility that the defendant might escape to summon aid or interfere with the execution of the search warrant; a police officer made a quick on-the-spot

*decision that the safety of the police officers could best be protected by bringing the defendant inside the house and keeping him under surveillance with the other occupants of the house; the search warrant indicated that the house had been a place of drug traffic only one day earlier; the defendant had just left the house when the police arrived and had admitted that he lived there, and communicated with the people inside the house indicating a relationship between them; and the police were forced to break open the door to gain admission (US Const, Am IV; Const 1963, art 1, § 11).*

15. SEARCHES AND SEIZURES — ARREST — OCCUPANTS OF PREMISES.

    *Police officers executing a search warrant for certain premises may lawfully detain all persons found there until the search is concluded; if persons are left free to roam about the premises while the warrant is being executed, they could well destroy or carry off objects of the search (US Const, Am IV; Const 1963, art 1, § 11).*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Timothy A. Baughman,* Assistant Prosecuting Attorney, for the people.

*Gerald M. Lorence* for defendant.

BLAIR MOODY, JR., J. On October 10, 1974, a team of Detroit police officers was dispatched to execute a warrant to search premises located at 9356 Mansfield. The warrant was issued to search the premises and seize heroin and any other narcotics materials and paraphernalia, but did not specify persons to be searched. The owner of the premises was not named in the search warrant. The only reference to a particular person was a statement contained in the warrant indicating that the informant had previously purchased heroin at the Mansfield address from a black male known as "George".

Upon arriving at the named address, Officer Roger Lehman saw the defendant go out the front door of the house and proceed across the porch and down the steps. When defendant was asked to open the door he replied that he could not because he left his keys inside, but he could ring someone over the intercom. Dwight Calhoun came to the door, but did not admit the police officers. As a result, the officers obtained entrance to the premises by forcing open the front door. Once admittance had been gained Officer Lehman instructed Officer Conant, previously stationed along the side of the house, to bring the defendant, still on the porch, into the house.

After the eight occupants of the house were detained, a search of the premises revealed two plastic bags of suspected narcotics under the bar in the basement. After finding the suspected narcotics in the basement and upon determining that the defendant was the owner of the house, Officer Conant formally arrested the defendant for violation of the Controlled Substances Act of 1971. MCL 335.341(4)(a); MSA 18.1070(41)(4)(a). A custodial search conducted by Officer Conant revealed a plastic bag containing suspected heroin in the defendant's jacket pocket. It is this heroin, discovered on the person of the defendant, that forms the basis of the instant possession charge.

Following a preliminary examination, defendant was bound over for trial. On November 19, 1974, the trial court granted a motion to suppress the evidence and quashed the information. Subsequently, the Court of Appeals affirmed the trial court. 68 Mich App 571; 243 NW2d 689 (1976). We granted leave to appeal on February 8, 1977. 399 Mich 828 (1977).

The dispositive issue presented for resolution is

whether the police officers had probable cause to arrest the defendant without a warrant when defendant was seized and detained while leaving his home prior to execution of the premises search warrant.

Statutory authority for an officer to arrest without warrant is set forth in MCL 764.15; MSA 28.874, which provides in relevant part:

"Any peace officer may, without a warrant, arrest a person—

*  *  *

"(d) When he has reasonable cause to believe that a felony has been committed and reasonable cause to believe that such person has committed it."

Probable cause for an arrest has been defined as any facts which would induce a fair-minded person of average intelligence and judgment to believe that the suspected person has committed a felony. *People v Ward,* 226 Mich 45; 196 NW 971 (1924). Furthermore, the facts upon which such belief is based must be present at the moment of arrest. *People v Stewart,* 232 Mich 670; 206 NW 337 (1925).

Therefore, in reviewing a claim that a police officer lacked probable cause to arrest, the reviewing court must determine whether facts available to the officer at the moment of arrest would justify a fair-minded person of average intelligence in believing that the suspected person had committed a felony. Each case must be analyzed in light of the particular facts confronting the arresting officer. *People v Harper,* 365 Mich 494; 113 NW2d 808 (1962).

According to the facts, defendant had left the premises before the search party arrived and was

proceeding down the front porch steps when approached by Officer Lehman. At that point in time, Officer Lehman detained the defendant for purposes of limited inquiry and ascertained that the defendant lived at the named premises. There is no evidence that a frisk of the defendant was made. Defendant's behavior pursuant to the police officer's request for admittance to the premises can be categorized only as cooperative.

However, the testimony of Officer Conant at the preliminary examination indicates that the defendant was not free to leave the front porch as the premises search warrant was being executed, but was instead escorted into his house and deprived of his liberty.[1] At that time the initial inquiry and

---

[1] "*Q. [Mr. Mitchell, defense counsel]:* All right. Well when you came around to the front of the house you did see—you did see Mr. Summers, is that right?

"*A. [Officer Conant]:* I did.

"*Q.* And Mr. Summers was outside of the house, is that right?

"*A.* He was.

"*Q.* Now Mr. Summers was outside of the house, and you took him back in the house, is that right?

"*A.* I did.

"*Q.* Now he wasn't a member of your crew, was he?

"*A.* No, he was not.

* * *

"*Q.* You didn't see anybody. Did you ever lift him up and bring him back up on the porch as he was knocked down?

"*A.* No, I did not. After we gained entry Patrolman Lehman told me to bring him on inside.

"*Q.* All right. You took him on inside?

"*A.* I did.

"*Q.* Now when you went inside, what did you do immediately after you got inside?

"*A.* Well I was in the living room with Mr. Summers.

"*Q.* All right. You kept Brother Summers right close to you, is that right?

"*A.* He was there.

"*Q.* All right. What did you do after you kept him in your close view like that; did you ever go anyplace else in the house?

"*A.* Not until after the house was secured, then I went to the basement."

cooperative response terminated. This further detention of the defendant, by bringing him into the house, was a "seizure" as defined by the United States Supreme Court:

"Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v Ohio,* 392 US 1, 19, fn 16; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

We conclude that the seizure of defendant, unsupported by probable cause, was violative of the Fourth Amendment.

The standard for determining whether a police officer's seizure-detention of a citizen violates the Fourth Amendment is clearly set forth by the United States Supreme Court in the recent decision of *Dunaway v New York,* 442 US 200; 99 S Ct 2248; 60 L Ed 2d 824 (1979). Justice Brennan's majority opinion holds that detention of a citizen beyond the narrow scope of *Terry v Ohio, supra,* and its progeny, is reasonable only if supported by probable cause for arrest. *Thus, the general standard for determining whether a seizure-detention is legal is not whether the police officer's actions were reasonable under the circumstances but rather whether the police officer had probable cause to arrest.*

In *Dunaway,* the Court explained that prior to the *Terry* decision arrests were equated with seizures requiring probable cause to justify the intrusion under the Fourth Amendment:

"Before *Terry v Ohio,* 392 US 1 (1968), the Fourth Amendment's guarantee against unreasonable seizures

of persons was analyzed in terms of arrest, probable cause for arrest, and warrants based on such probable cause. The basic principles were relatively simple and straightforward: The term 'arrest' was synonymous with those seizures governed by the Fourth Amendment. While warrants were not required in all circumstances, the requirement of probable cause, as elaborated in numerous precedents, was treated as absolute. The 'long-prevailing standards' of probable cause embodied 'the best compromise that has been found for accommodating [the] often opposing interests' in 'safeguard[ing] citizens from rash and unreasonable interferences with privacy' and in 'seek[ing] to give fair leeway for enforcing the law in the community's protection'. *Brinegar v United States,* 338 US 160, 176 [69 S Ct 1302; 93 L Ed 1879] (1949). The standard of probable cause thus represented the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest 'reasonable' under the Fourth Amendment. The standard applied to all arrests, without the need to 'balance' the interests and circumstances involved in particular situations." (Footnotes omitted.) *Dunaway,* pp 207-208.

The exception to this general rule was carefully carved out in the *Terry* opinion:

"*Terry* for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause. That case involved a brief, on-the-spot stop on the street and a frisk for weapons, a situation that did not fit comfortably within the traditional concept of an 'arrest'. * * * [T]he Court established 'a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime'. * * * *Terry* departed from traditional Fourth Amendment analysis in two respects. First, it defined a special category of Fourth

Amendment 'seizures' so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons." (Footnotes omitted.) *Dunaway,* pp 208-210.

The *Dunaway* Court clearly indicated its intent to maintain the narrow scope of *Terry.* The Court expressly reaffirmed the essential viability of the probable cause standard and specifically refused to expansively apply the *Terry* balancing test:

"In effect, respondent urges us to adopt a multifactor balancing test of 'reasonable police conduct under the circumstances' to cover all seizures that do not amount to technical arrests. But the protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when the balancing may be done in the first instance by police officers engaged in the 'often competitive enterprise of ferreting out crime'. *Johnson v United States,* 333 US 10, 14 [68 S Ct 367; 92 L Ed 436] (1948). A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront. Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proved protections afforded by the general rule, are reflected in the narrow limitations emphasized in the cases employing the balancing test. For all but those narrowly defined intrusions, the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause." (Footnotes omitted.) *Dunaway,* pp 213-214.

In describing the nature of the narrow intrusions sanctioned under a *Terry* test, the Court stressed that a permissible intrusion is restricted to brief questioning regarding suspicious activity and to limited weapons frisks necessary to insure safety:

"Because *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope. *Terry* itself involved a limited, on-the-street frisk for weapons. Two subsequent cases which applied *Terry* also involved limited weapons frisks. See *Adams v Williams,* 407 US 143 [92 S Ct 1921; 32 L Ed 2d 612] (1972) (frisk for weapons on basis of reasonable suspicion); *Pennsylvania v Mimms,* 434 US 106 [98 S Ct 330; 54 L Ed 2d 331] (1977) (order to get·out of car is permissible *'de minimis'* intrusion after car is lawfully detained for traffic violations; frisk for weapons justified after 'bulge' observed in jacket). *United States v Brignoni-Ponce,* 422 US 873 [95 S Ct 2574; 45 L Ed 2d 607] (1975), applied *Terry* in the special context of roving border patrols stopping automobiles to check for illegal immigrants. *The investigative stops usually consumed less than a minute and involved 'a brief question or two'.* 422 US, at 880. The Court stated that '[b]ecause of the limited nature of the intrusion, stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest'. Ibid. See also *United States v Martinez-Fuerte,* 428 US 543 [96 S Ct 3074; 49 L Ed 2d 1116] (1976) (fixed checkpoint to stop and check vehicles for aliens); *Delaware v Prouse,* 440 US 648 [99 S Ct 1391; 59 L Ed 2d 660] (1979) (random checks for drivers' licenses and proper vehicle registration not permitted on less than articulable reasonable suspicion).

\* \* \*

"Indeed, *Brignoni-Ponce* expressly refused to extend *Terry* in the manner respondent now urges. The Court there stated: 'The officer may question the driver and passengers about their citizenship and immigration

status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause'. 422 US, at 881-882. * * * Accord, *United States v Martinez-Fuerte, supra,* at 567." (Footnotes omitted.) (Emphasis changed.) *Dunaway,* pp 210-212.[2]

Applying *Dunaway* to the specific facts of this case, the seizure of defendant on the porch and his subsequent detention were not, by nature, limited intrusions permissible under *Terry* and subsequent cases. Clearly these facts do not involve the special context of border patrol interrogations or traffic infractions. The defendant was stopped and questioned in front of his home. He answered the inquiries and attempted to assist the officers to gain entrance to the premises. The defendant's conduct at no time gave a basis for the officers to suspect unlawful activity on his part or to fear for their safety. Indeed, the officers chose not to frisk the defendant. This initial stop and brief questioning was completed. At that point, the officers had exhausted any *Terry* basis to further restrain the defendant.

When the defendant's liberty was thereafter restrained, the police officers must have had probable cause to arrest the defendant to render the seizure-detention reasonable under the Fourth Amendment. To sanction a further detaining of defendant without probable cause would in effect

[2] Most recently, in a case subsequent to *Dunaway,* the United States Supreme Court again steadfastly refused to broaden the scope of an intrusion permissible under *Terry. Ybarra v Illinois,* — US —; 100 S Ct 338; 62 L Ed 2d 238 (1979). The primary issue presented for resolution in *Ybarra* was whether the *search* of a person who was present in a tavern during the execution of a search of the premises was justified under the *Terry* test as a frisk or was supported by probable cause. The Court reiterated that the *Terry* exception should be applied in the limited circumstances of a frisk for *weapons* by an officer who has reason to believe the *individual confronted* is "armed and presently dangerous".

replace the fundamental and essential probable cause standard with a multifactor balancing test specifically rejected by the United States Supreme Court in *Dunaway*.

Although not formally arrested until after the suspected heroin was discovered in the basement, the defendant was for all practical purposes arrested without a warrant when he was "seized" on his front porch, at a time when the police officers did not have probable cause to believe that the *defendant* had committed or was committing a felony.[3] The heroin seized from defendant, constituting the "fruits" of his unlawful arrest, must be

---

[3] In *Ybarra v Illnois*, — US —; 100 S Ct 338, 62 L Ed 2d 238 (1979), the Supreme Court stressed that when determining whether probable cause existed to search or seize a person, the focus of the inquiry is upon the activities of the individual confronted:

"Not only was probable cause to search Ybarra absent at the time the warrant was issued; it was still absent when the police executed the warrant. Upon entering the tavern, the police did not recognize Ybarra and had no reason to believe that *he* had committed, was committing or was about to commit any offense under state or federal law. Ybarra made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers. In short, the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale.

"It is true that the police possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed. *But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Sibron v New York,* 392 US 40, 62-63 [88 S Ct 1889; 20 L Ed 2d 917 (1968)]. *Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.* This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the 'legitimate expectations of privacy' of persons, not places. See *Rakas v Illinois,* 439 US 128, 138-143, 148-149 [99 S Ct 421; 58 L Ed 2d 387 (1978)]; *Katz v United States,* 389 US 347, 351-352 [88 S Ct 507; 19 L Ed 2d 576 (1967)]." (Footnote omitted.) (Emphasis added.)

excluded. *Wong Sun v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963). Accordingly, the trial court's suppression of the evidence in the instant case is affirmed.

KAVANAGH, LEVIN, and RYAN, JJ., concurred with BLAIR MOODY, JR., J.

WILLIAMS, J. *(for reversal).* We granted leave to appeal in this case to determine the constitutional validity of a search of defendant and the seizure pursuant thereto of a plastic bag of heroin from defendant's jacket pocket. The ultimate permissibility of this search and seizure, however, rests in turn on whether two prior "seizures" of defendant's person were constitutional: (1) the police bringing defendant, who had just left his house, from his outdoor porch into his house and his detention therein while a valid premises search warrant for heroin and any other narcotic materials and paraphernalia was executed, and (2) the formal arrest of the defendant, based upon his ownership-occupancy of the premises named in the warrant, following the discovery of suspected narcotics in the basement of his house.

Considered within the totality of circumstances in this case, we find that neither of these prior "seizures" of defendant contravened the general proscription against unreasonable seizures[1] of ei-

---

[1] US Const, Am IV provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Const 1963, art 1, § 11 provides, in pertinent part:

"The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation."

ther the Fourth Amendment to the Federal Constitution, US Const, Am IV, or this state's Constitution, Const 1963, art 1, § 11. Bringing defendant inside from his porch and then detaining him therein while the premises search warrant was being executed was "reasonable" police action in this case. *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Defendant's arrest inside after suspected narcotics were found in his basement pursuant to the search warrant was valid because it was based on probable cause. Accordingly, we hold that the ensuing seizure of the heroin from · defendant's person was constitutionally permissible as the product of an allowable search incident to a valid arrest. See *Chimel v California,* 395 US 752; 89 S Ct 2034; 23 L Ed 2d 685 (1969). We therefore reverse the Court of Appeals affirmance of the trial court's suppression of the heroin seized from defendant's person and its quashing of the information.

## I. FACTS

Because the factual setting of a specific search or seizure is usually of paramount importance in determining the constitutional validity of that search or seizure, we take careful pains to delineate the particular circumstances of this case which we feel, viewed in their totality, sanction the police conduct in question.

On the evening of October 10, 1974, a team of Detroit police officers was sent to 9356 Mansfield in the City of Detroit to execute a premises search warrant for heroin and any other narcotic materials and paraphernalia. The warrant was supported by information from an informant who had purchased heroin at this same address just the day before.

Upon arriving at the premises named in the warrant, police officers Lehman and Conant witnessed defendant leave the premises to be searched through the front door and proceed down the front porch steps. At this point Officer Lehman approached defendant, identified himself as a police officer, and asked defendant if he lived in the house he had just exited. Upon defendant's affirmative response, Officer Lehman showed the search warrant to him and told him to open up the house if he could. Defendant, since he had left his keys inside, cooperated with this request by using the intercom to summon someone inside the house to open the door.

Dwight Calhoun opened the inner door to the house in response to defendant's request. Officer Lehman then identified himself as a police officer and told Calhoun to open the door. Calhoun did not comply with this direction, so Officer Lehman attempted to open the storm door only to discover that it was locked. At that time, Calhoun slammed the inner door shut in Officer Lehman's face. Thereupon Officer Lehman instructed three other officers who were present to break down the door. Once admittance had been gained, Officer Lehman instructed Officer Conant, previously stationed along the side of the house, to bring defendant, still on the porch, into the house.

In order to secure the premises prior to the search, defendant and the other persons in the house were taken into the living room by the police officers and were detained there while the search was conducted.

In the course of the search, two plastic bags containing suspected narcotics were found in the basement. Thereafter, defendant, who was by then known to be the owner of the house, was arrested.

A custodial search following this arrest revealed a plastic bag containing suspected narcotics in defendant's jacket pocket. It is these narcotics, later determined to be heroin, which form the basis for the instant charge of violation of the Controlled Substances Act of 1971. MCL 335.341(4)(a); MSA 18.1070(41)(4)(a).

Following a preliminary examination, defendant was bound over for trial. However, on November 19, 1974, the trial court granted defendant's motion to quash the information because it held the heroin to have been improperly seized from defendant. This finding was predicated upon both the trial court's belief that no probable cause existed to arrest defendant and the fact that defendant was not present in the house voluntarily.

The Court of Appeals affirmed the trial court for basically the same reasons. 68 Mich App 571; 243 NW2d 689 (1976).

We granted leave to appeal on February 8, 1977. 399 Mich 828 (1977).

## II. *DUNAWAY* AND *TERRY*

There can be no question that the police "seized" defendant when they required him to go back inside his house and remain there during the execution of the legal search warrant.[2] *Terry, supra,* 19, fn 16. Such a determination, however, far from ends our inquiry into the constitutional per-

---

[2] We do not find the police action in confronting defendant as he proceeded down his front porch steps a "seizure". The police, at this point, were simply seeking voluntary cooperation on defendant's part in gaining admission to his house. There was no apparent restraint of defendant's liberty. As the Supreme Court noted in *Terry v Ohio,* 392 US 1, 19, fn 16; 88 S Ct 1868; 20 L Ed 2d 889 (1968), "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons". Indeed, Justice MOODY would categorize defendant's behavior pursuant to the police request for admittance as "cooperative".

missibility of the police action in question. The United States Supreme Court has taught us that " '[s]earch' and 'seizure' are not talismans". *Terry, supra,* 19. Thus just as the Court in *Terry* was quick to reject the notion that the Fourth Amendment does not come into play at all as a limitation upon police conduct just because an officer may stop short of something called a "technical arrest", *id.,* 19, so must we be wary of erring in the reverse manner by uncritically labeling a "seizure" an "arrest" and then characterizing it as "illegal" since it was made without probable cause. Rather, we must ask whether this "seizure" of defendant, under the circumstances of this case, was violative of the state and Federal constitutional proscriptions against *unreasonable* seizures.

Because we recognize that the police did not have probable cause to arrest defendant at the time they encountered him on his porch, his "seizure" there is valid only if it comes within the rule of *Terry, supra,* and its progeny. That rule, of course, permits certain "seizures" or "detentions" as "reasonable" under the constitutional prohibitions against "unreasonable searches and seizures", on facts that do not constitute probable cause to arrest.[3] However, in order to properly understand the scope of the rule of *Terry* and its progeny, consideration must be given to the recent United States Supreme Court decision of *Dunaway v New York,* 442 US 200; 99 S Ct 2248; 60 L Ed 2d 824 (1979), which both recognizes the validity and indicates the limits of the *Terry-* and-progeny rule. In *Dunaway* the Court stated:

"Thus, *Terry* departed from traditional Fourth Amendment analysis in two respects. First, it defined a

---

[3] See fn 1 for citation and text.

special category of Fourth Amendment 'seizures' so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons." *Dunaway, supra,* 209-210.

While *Terry* itself was a pat-down-for-weapons case, as was *Adams v Williams,* 407 US 143; 92 S Ct 1921; 32 L Ed 2d 612 (1972), others of the progeny are not. For example, *Pennsylvania v Mimms,* 434 US 106; 98 S Ct 330; 54 L Ed 2d 331 (1977), held a police order that a driver get out of his automobile a "de minimis" and reasonable intrusion after the car was lawfully detained for a traffic violation; *United States v Brignoni-Ponce,* 422 US 873; 95 S Ct 2574; 45 L Ed 2d 607 (1975), allowed roving border patrols to make investigative stops of automobiles to check for illegal immigrants on less than probable cause, *i.e.,* on reasonable suspicion that a particular vehicle may contain aliens who are illegally in the country; *United States v Martinez-Fuerte,* 428 US 543; 96 S Ct 3074; 49 L Ed 2d 1116 (1976), approved of fixed checkpoints to stop and check vehicles for aliens in the absence of any individualized suspicion. Indeed, Justice White's concurring opinion in *Dunaway* recognizes the wider application of *Terry* and its progeny as follows:

"The opinion of the Court might be read to indicate that *Terry v Ohio,* 392 US 1 (1968), is an almost unique exception to a hard-and-fast standard of probable cause. As our prior cases hold, however, the key principle of the Fourth Amendment is reasonableness—the balancing of competing interests. *E.g., Delaware v Prouse,* 440

US 648, 653-654 [99 S Ct 1391; 59 L Ed 2d 660] (1979); *Michigan v Tyler,* 436 US 499, 506 [98 S Ct 1942; 56 L Ed 2d 486] (1978); *Marshall v Barlow's, Inc,* 436 US 307, 321-322 [98 S Ct 1816; 56 L Ed 2d 305] (1978); *United States v Martinez-Fuerte,* 428 US 543, 555 (1976); *United States v Brignoni-Ponce,* 422 US 873, 878 (1975); *Terry v Ohio, supra,* at 20-21; *Camera v Municipal Court of San Francisco,* 387 US 523, 536-537 [87 S Ct 1727; 18 L Ed 2d 930] (1967)." *Dunaway, supra,* 219.

Close analysis of *Dunaway* and *Terry* and progeny suggests that basically there are four criteria to be considered in balancing to determine reasonableness:

First, was the police action taken in an atmosphere requiring rapid reaction to the exigencies encountered in the field such as the on-the-spot decision to stop and frisk suspicious individuals "casing" a store in *Terry,* or was the police action the result of a deliberate, planned decision such as the order to follow up an informant's lead by going out to "pick up" a person and "bring him in" for interrogation in *Dunaway?*

Second, was the police officer's belief in the necessity for action to protect the public peace and safety justified at its inception as where, for example, the careful surveillance by an experienced officer of the store "casings" in *Terry* warranted the officer in believing the individuals might be contemplating a daylight robbery which it would be reasonable to assume would be likely to involve the use of weapons?

Third, was the "intrusion" on the individual's privacy by the police reasonably related in scope to the circumstances which justified the interference in the first place? In *Terry* the "intrusion" was limited to a pat-down for weapons during the investigation of suspicious behavior where the offi-

cer had reason to believe that he was dealing with armed and dangerous individuals; in *Mimms,* there was only a request to get out of a car following a lawful detention for a traffic violation; in *Brignoni-Ponce* the Court stated that a reasonable suspicion that a certain car contained illegal aliens would allow the officer to stop the car briefly and question the driver and passengers about their citizenship and immigration status, and ask them to explain suspicious circumstances; in *Martinez-Fuerte* there was merely a fixed checkpoint stop requiring a vehicle's occupants to respond to a brief question or two and. perhaps produce a document evidencing a right to be in the United States. Visual inspection of the vehicle was limited to what could be seen without a search;[4] in *Dunaway,* on the other hand, the intrusion was severe. Not only was the defendant "picked up" in a neighbor's home, but he was subjected to custodial interrogation on the basis of mere reasonable suspicion.

Fourth, was the "seizure" reasonable in order to protect the officer's safety?[5] This criterion was stressed in *Terry*— "the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. * * * American crimi-

---

[4] The Court stressed in both *Brignoni-Ponce* and *Martinez-Fuerte* that "any further detention or search must be based on consent or probable cause". *Brignoni-Ponce, supra,* 882; *Martinez-Fuerte, supra,* 567.

[5] By the inclusion of this fourth criterion, we do not mean to imply that the lack of legitimate safety concerns on the part of a police officer will, *ipso facto,* render the police action "unreasonable" and therefore constitutionally impermissible where probable cause is lacking. In *Brignoni-Ponce, supra,* for example, it was the governmental concern over illegal immigrants, and not over a police officer's safety, which the Court found to outweigh the official interference with individual liberty involved in that case.

nals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded", *Terry, supra,* 23—and in *Mimms*— "We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty." *Mimms, supra,* 110.

In justifying a particular intrusion, the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, meet these four criteria of "reasonableness". These facts, in turn, are to be subjected to the neutral scrutiny of a judge who must evaluate the "reasonableness" of a particular search or seizure in light of the particular circumstances. In making this assessment it is "imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry, supra,* 21-22. In applying these principles to the instant case we are acutely aware of the fact that, as one court put it,

"Whether an officer's conduct was 'reasonable' or 'appropriate' depends on the facts and circumstances of the particular case, so that the decision in one case seldom furnishes a pat answer in another case. A principle to be applied generally however is that in judging the reasonableness of the actions of the officer the circumstances before him are not to be dissected and viewed singly; rather they must be considered as a whole. So considered they are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v Hall,* 174 US App DC 13, 15; 525 F2d 857, 859 (1976) (citations omitted).

## III. APPLICATION OF CRITERIA TO INSTANT CASE

### A. *Defendant's Transfer Inside From Porch*

The action taken by the police in bringing defendant inside his house from the porch was a rapid, in-the-field reaction to the perceived necessities of the situation and thus satisfies the first of the four criteria. Confronted with the possibility that an admitted inhabitant of a house where trafficking in drugs was allegedly conducted might escape to summon aid or himself interfere with the execution of the warrant, Officer Lehman made a quick, on-the-spot decision that the safety of the officers could be best protected by bringing defendant inside and keeping him under surveillance with the rest of the occupants of the house. The urgent and unanticipated circumstances surrounding the police action in the instant case bear not even the slightest resemblance to the deliberate decision to pick up the defendant in *Dunaway* and bring him down to the station house for interrogation. Rather, the decision to "seize" the defendant in the case at bar was made under necessitous circumstances akin to those in *Terry.*

As regards the second criterion—the officers' belief in the necessity for action to protect the public peace and safety—we believe the situation, when viewed as a whole, justified a "reasonable and cautious police officer" in taking the action which Officers Lehman and Conant took. They were possessed of a search warrant indicating that the premises they were about to search had been a place of drug traffic only one day earlier. The door abruptly slammed in the officer's face when he identified himself as a police officer reasonably confirmed the likelihood that illegal activities were being carried on in the premises. Furthermore, there was a reasonable nexus between defendant

and the premises. Defendant had just left the house, had admitted he lived there, and his communication with those inside indicated a recognized relationship. The need for prudent and comprehensive action inherent in the fact that the main object of the search warrant was heroin, a white powder which can be easily secreted or destroyed, see *State v Johnson,* 102 RI 344, 354; 230 A2d 831, 836 (1967), justified not allowing defendant to run loose. Further, we recognize the fact that armed violence not infrequently accompanies the use of or traffic in narcotics—a fact well-known to the police. *Cf., People v Nefzger,* 173 Colo 199, 200-201; 476 P2d 995, 996 (1970).

Accordingly, we find the police belief in the necessity of action to have been justified at its inception. Like the police decision in *Terry* to seize an individual and pat his clothing down for weapons, we cannot say that the police decision to bring defendant inside "was the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment * * *". *Terry, supra,* 28.

As for the third criterion, we believe that the scope of the intrusion of the officials under these circumstances was reasonable. Merely requiring defendant to cross his own threshold while the warrant was being executed was a narrow intrusion designed to ensure the officers' safety. It did not go beyond the kind of intrusion justified by the attendant safety concerns. Just as the officer in *Mimms, supra,* could constitutionally require an individual, based on general safety concerns, to get out of his car after a lawful stop even in the total absence of any articulable suspicion to suspect foul play from the particular driver at the time of the stop, *a fortiori,* we believe it was permissible for the police to require the defendant to enter his

own house while the officers executed a valid search warrant in the face of numerous objective, observable facts to support a reasonable concern for their safety. A law enforcement officer, when engaged in the performance of his or her duties, must act on a quick appraisal of the facts before him or her without the benefit of the hindsight which is usually possessed by those reviewing such actions. Sitting within the safe confines of our chambers, we decline to hold the police action in this case unwarranted. See *People v Crawl,* 401 Mich 1, 14; 257 NW2d 86 (1977) (opinion of Chief Justice, then Justice, COLEMAN). On balance then, we find the important state interest in the officers' safety to outweigh this relatively minor intrusion into defendant's personal liberty.

Finally, we believe the fourth criterion to have been met. We think it beyond peradventure that the police in the instant case could have reasonably feared for their safety had they allowed defendant to remain at large outside the house while they were occupied within with the search warrant's execution. We must remember that Officer Lehman knew the defendant to be an occupant of this house in which the presence of narcotics was suspected and into which the police were required to force entry. Officer Lehman also knew that defendant was aware, at a minimum, that the police had come to his residence in search of something,[6] since Officer Lehman testified that he had shown the search warrant to the defendant. The person of reasonable caution could hardly be considered timorous in believing such a situation possesses violent potentialities. Such a person, un-

---

[6] The preliminary examination did not reveal whether the defendant actually read the search warrant, thus finding out that the object of the search was narcotics, or whether he just knew the officers had the authority to search for something.

der these circumstances, might quite logically fear for his or her own safety in executing a premises search warrant if that person knows that the individual permitted to move about freely outside the premises is aware that the object of the search, if found, could quite possibly be incriminating. The untended individual might alone or with summoned aid harm the police either while inside or on leaving.[7] As the Court in *Terry* states:

"a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime."

"The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry, supra,* 26-27.

In sum, the four criteria having been satisfied, we find defendant's transfer to inside his house to have been "reasonable" and therefore constitutionally permissible.

### B. Defendant's Detention Inside

Having found it "reasonable" in this case to bring defendant back across his threshold, we must next determine whether it was reasonable to

---

[7] There are three reasons to distinguish the instant case from the recent case of *Ybarra v Illinois,* — US —; 100 S Ct 338; 62 L Ed 2d 238 (1979): first, the existence of specific, articulable facts in the present case, supporting as reasonable, fear on the part of the officers for their safety, whereas the majority in *Ybarra* said "the State is unable to articulate any specific fact * * *", *Ybarra, supra,* slip opinion, p 7; second, the intrusion on the instant defendant's privacy by requiring him to step over his own threshold was minimal compared with the pat-down and subsequent search in *Ybarra;* and third, the instant case deals with a private residence from which narcotics had been sold, whereas *Ybarra* involved a public tavern for the sale of liquor whose bartender reportedly possessed narcotics.

keep him there. Although there is no Michigan case which specifically addresses the question of whether it is lawful for police officers to detain all persons found on certain premises during the execution of a search warrant for those premises, other courts have held such a detention legitimate. These courts reason that if individuals are left free to roam about the premises while the warrant is being executed, they could well destroy or carry off objects of the search. *City of Olympia v Culp,* 136 Wash 374, 377; 240 P 360, 361 (1925); *State v Ryan,* 163 Wash 496, 502; 1 P2d 893, 896 (1931); *State v Valdez,* 91 NM 567, 568-569; 577 P2d 465, 467 (Ct App, 1978). We agree. Indeed, the Federal First Circuit treated a challenge to such detention as "clearly frivolous" when it said,

"While appellant also contends that the search warrant [for the premises of his office] did not permit government agents to forcibly detain him, and that the restraint thereby imposed upon him prior to his actual arrest invalidated the warrant, we find these latter claims clearly frivolous." *United States v Micheli,* 487 F2d 429, 430 (CA 1, 1973).

We also note that the safety rationale which justified bringing defendant inside his house in the first place would understandably continue to apply to his detention and surveillance once inside.[8]

## IV. PROBABLE CAUSE TO ARREST DEFENDANT

With respect to the instant case, a police officer generally has probable cause to arrest, without a warrant, the known and present owner-occupant

---

[8] Since there is no evidence that the officers frisked defendant prior to his formal arrest, we have no occasion to consider whether such an action would have been reasonable under the circumstances. *Cf. People v Nefzger,* 173 Colo 199, 200-201; 476 P2d 995, 996 (1970).

of premises wherein suspected narcotics are discovered pursuant to a valid premises search warrant. Probable cause to believe that a particular person has committed a particular offense is not the equivalent of guilt beyond a reasonable doubt. Thus the Court of Appeals reliance on *People v Davenport*, 39 Mich App 252; 197 NW2d 521 (1972), in finding that there was an insufficient nexus between the instant defendant and the narcotics seized in his house to provide probable cause for arrest, was misplaced. *Davenport* dealt with the insufficiency of mere joint occupancy of a house to *convict* one of four occupants of knowingly possessing narcotics found in the basement of the house, and not with *probable cause to arrest*. Thus the "seizure" of defendant—his formal arrest—inside his own house following the discovery of suspected narcotics in his basement (defendant having admitted that he owned the house) was constitutionally valid because it was based on probable cause.

## V. CONCLUSION

Since we have found the "seizures" of defendant to be constitutionally permissible because they were "reasonable" under the circumstances of this case, the trial court erred in granting defendant's motion to quash the information and in suppressing the heroin found on defendant. Accordingly, we reverse the Court of Appeals affirmance of the trial court's ruling and remand the case to the trial court for further proceedings not inconsistent with this opinion.

COLEMAN, C.J., and FITZGERALD, J., concurred with WILLIAMS, J.