PEOPLE v EMANUEL

Docket No. 78-1738. Submitted January 9, 1980, at Detroit.—Decided
    June 16, 1980. Leave to appeal applied for.

Lawrence Emanuel was convicted of first-degree murder and
    arson of a dwelling house following a jury trial in Wayne
    Circuit Court, Patrick J. Dugan, J. At that trial, two state-
    ments given by defendant to the City of Taylor police were
    admitted into evidence over the objection that the statements
    were the fruit of defendant's unlawful arrest. It was established
    that defendant had discussed his involvement in these crimes
    with two Detroit police officers, one of those officers being
    defendant's cousin, and had indicated that he was going to talk
    to the City of Taylor police, since the crimes took place in
    Taylor. One of the Detroit officers informed the Taylor police.
    Taylor police officers went to defendant's home and asked him
    to accompany them to the Taylor police station for questioning.
    While defendant was not placed under arrest, the officers
    indicated that if defendant had not agreed to accompany them
    to the police station he would have been placed under arrest.

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Arrest § 2.
[2-4] 29 Am Jur 2d, Evidence § 546.
    Suppression before indictment or trial of confession unlawfully
        obtained. 1 ALR2d 1012.
    Admissibility of pretrial confession in criminal case—Supreme
        Court cases. 1 L Ed 2d 1735; 4 L Ed 2d 1833; 12 L Ed 2d 1340; 16
        L Ed 2d 1294; 22 L Ed 2d 872.
[3, 4] 29 Am Jur 2d, Evidence §§ 543, 544.
[5, 6] 29 Am Jur 2d, Evidence §§ 367, 372.
    Admissibility of evidence as to extrajudicial or pretrial identifica-
        tion of accused. 71 ALR2d 449.
[7] 5 Am Jur 2d, Appeal and Error § 713.
    29 Am Jur 2d, Evidence § 249 et seq.
[8] 5 Am Jur 2d, Appeal and Error § 803.
    29 Am Jur 2d, Evidence § 249 et seq.
    81 Am Jur 2d, Witnesses § 238.
    Privilege, in judicial or quasi judicial proceedings, arising from
        relationship between psychiatrist or psychologist and patient. 44
        ALR3d 24.

At the police station, defendant made an exculpatory statement. On the following day, defendant gave a second statement after being informed that the story given by an accomplice was at variance with defendant's prior statement.

During the trial, defendant sought to suppress certain identification testimony on the basis that the prosecutor had informed defense counsel that the witness would have no identification testimony and that the in-court identification was tainted by a pretrial observation of the defendant. The trial court determined that the prosecutor in good faith believed that the witness had no identification testimony and permitted the in-court identification.

The accomplice testified for the prosecution. Defense counsel sought to call that person's psychiatrist for the purpose of impeaching her testimony. The prosecution objected on the basis of the psychiatrist-patient privilege. Defense counsel made no offer of proof to show that the testimony of the psychiatrist was demonstrably relevant to any matter in this case. The trial court refused to permit the psychiatrist to be called as a witness.

Defendant appeals. *Held:*

1. The request by the Taylor police that defendant accompany them to the police station, that request being under circumstances in which noncompliance with the request would have resulted in defendant's formal arrest, constituted a seizure of defendant's person and was therefore an arrest within the meaning of the Fourth Amendment of the United States Constitution. The statement given by defendant during the interrogation following that arrest thus would be admissible at trial only if it was shown that the statement was an act of free will, purged of the primary taint of the unlawful arrest.

2. The statement of defendant following the illegal arrest was independent of the taint of that arrest since the quintessential variable which motivated the defendant to make that confession was not the illegal arrest but rather was defendant's voluntary discussion of the matter with the Detroit police officers and defendant's previously expressed intent to turn himself in to the police. The first statement by defendant, therefore, was properly admitted at trial.

3. Even if comments made by the police officer prior to the second statement by defendant constituted threats or promises of leniency, his statement was properly admitted into evidence, since the primary motivations for the second statement were defendant's prior admissible statement and the statement given by the accomplice. The second statement cannot be said to have

been coerced merely by reason of the fact that the police confronted defendant with the evidence against him.

4. The prosecutor's good faith statement to defense counsel that a witness did not have identification testimony did not mandate suppression of that witness's in-court identification testimony when it was ultimately determined that the witness did, in fact, have identification testimony. The failure of defense counsel to seek a pretrial lineup or to make any preliminary showing, other than mere conjecture, that any identification evidence flowing from a lineup would necessarily have been favorable to defendant militated against suppression of the in-court identification.

5. The prosecution's cross-examination of the defendant on collateral matters having minimal relevancy does not mandate reversal, since defense counsel pursued similar lines of inquiry. The Court of Appeals cannot say that manifest injustice occurred or that the trial court abused its discretion in permitting such inquiry.

6. The Court of Appeals will decline to address the question of the refusal of a trial judge to permit impeachment of a witness by examination of that witness's psychiatrist where the prosecution objects to such testimony on the basis of the psychiatrist-patient privilege and defense counsel fails to make an offer of proof showing that such testimony is demonstrably relevant. The defendant's right to confrontation is not abridged by the refusal to permit such testimony, since the exclusion of such evidence was not decisive to the outcome and was harmless error, if error at all.

Affirmed.

M. F. Cavanagh, J., concurred in the result only.

1. Arrest — Request by Police Officer — Circumstances of Request — Seizure of Person — Constitutional Law.

A request by police officers that a person accompany them to the police station under circumstances where, if that person did not comply with the request, he would be formally placed under arrest constitutes a seizure of that person and an arrest for purposes of the Fourth Amendment of the United States Constitution (US Const, Am IV).

2. Criminal Law — Evidence — Confession — Illegal Arrest — Admissibility of Evidence — Purging of Taint.

A confession given by a defendant during interrogation following an arrest that is illegal because the arrest was made without probable cause is not admissible in evidence at trial unless the

confession is sufficiently an act of free will so as to purge the primary taint of the unlawful arrest.

3. CRIMINAL LAW — EVIDENCE — CONFESSION — ILLEGAL ARREST — MOTIVATION FOR CONFESSION — ADMISSIBILITY OF EVIDENCE.

A confession given by a defendant following an illegal arrest is independent of the taint of that illegal arrest, and therefore admissible in evidence at trial, where the quintessential variable which motivated the defendant to make that confession was the defendant's prior voluntary discussion of the matter with police officers and his previously expressed intent to turn himself in to the police.

4. CRIMINAL LAW — EVIDENCE — CONFESSION — ADMISSIBILITY OF EVIDENCE — MOTIVATION FOR CONFESSION — COERCION.

A confession by a criminal defendant is not rendered inadmissible in evidence at trial, even if made after police threats or promises of leniency, where it is determined that the confession was given because of a prior admissible statement by the defendant in which he tended to implicate himself in the crime and because of a statement given by an accomplice in the crime; a confession is not coerced merely because the police confront a defendant with the evidence against him.

5. CRIMINAL LAW — EVIDENCE — IDENTIFICATION TESTIMONY — GOOD FAITH — APPEAL — CLEARLY ERRONEOUS.

A trial court's refusal to suppress identification testimony of a witness after the prosecutor informed defense counsel that no identification testimony would be heard from that witness does not mandate reversal where the Court of Appeals cannot say that the trial court's determination that the prosecutor's assurance was made in good faith was clearly erroneous.

6. CRIMINAL LAW — EVIDENCE — IDENTIFICATION TESTIMONY — SUPPRESSION — LINEUPS.

Suppression of in-court identification testimony is not mandated where a lineup was not requested and there was no preliminary showing, other than conjecture, that any identification evidence flowing from a lineup would necessarily have been favorable to the defense.

7. CRIMINAL LAW — EXAMINATION OF WITNESSES — RELEVANCE — APPEAL — MANIFEST INJUSTICE — ABUSE OF DISCRETION.

Prosecutorial examination of a defendant as to collateral matters of minimal relevancy does not mandate reversal where defense

counsel pursued similar lines of inquiry and the Court of Appeals cannot say either that manifest injustice resulted or that the trial court abused its discretion in permitting such inquiry.

8. CRIMINAL LAW — EVIDENCE — WITNESSES — PSYCHIATRIST-PATIENT PRIVILEGE — RELEVANCE — APPEAL — OFFER OF PROOF — CONFRONTATION — HARMLESS ERROR.

Reversible error is not established relative to the refusal by a trial judge to permit defense counsel in a criminal trial to call the psychiatrist of a prosecution witness for the purpose of impeachment of that witness where there was no offer of proof that the testimony excluded because of the assertion of the psychiatrist-patient privilege was demonstrably relevant; any claim that the exclusion of such testimony abridged the defendant's right to confrontation fails because the exclusion of such evidence, even if erroneous, was not decisive in the case and was harmless error.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Charles H. Seller,* Assistant Prosecuting Attorney, for the people.

*Daniel J. Wright* and *Mardi Crawford,* Assistant State Appellate Defenders, for defendant on appeal.

Before: R. M. MAHER, P.J., and M. F. CAVANAGH and CYNAR, JJ.

CYNAR, J. Following a lengthy jury trial, defendant was found guilty of first-degree premeditated murder, MCL 750.316; MSA 28.548, and of arson of a dwelling house, MCL 750.72; MSA 28.267. He received the mandatory life sentence on the former conviction and a concurrent 13 to 20 year term of imprisonment on the latter. Defendant appeals as of right.

I

The victim, one Lynn Bradfield, died of strangulation by ligature. At trial, the testimony established that defendant had met Taurus Duncan, an accomplice, some five years prior to the murder. Both knew the decedent. Duncan and the defendant became friends. At the time of the homicide, both were employed at the Chrysler Mound Road Engine Plant and often drove to and from work together. Duncan professed to being in love with defendant, who was married.

Approximately three years prior to the killing, Duncan had met the deceased. A year later, in 1975, Duncan went to California and remained domiciled there for a year. During that same period, the victim had given birth to a daughter, Renee, referred to as "Tiffany" by Ms. Duncan. When Duncan returned to Detroit, she told defendant that Renee was her child, that she had given birth to her while in California, and that he (Emanuel) was the father. She claimed that she had given "Tiffany" to the victim to care for her and that the victim and her husband had adopted Renee. Defendant from that point forward saw the child frequently, lavished gifts upon her, took her and Duncan on various outings, and introduced Renee to his family as his own child.

The day prior to the murder, June 16, 1977, Duncan and defendant twice spoke with regard to killing Lynn Bradfield and taking the child, although they both testified that it began as a joke.

Finally, that same evening, defendant and Duncan drove to the victim's apartment in Taylor, Michigan, using a car owned by defendant's father to avoid being recognized, as defendant's car had been seen in the vicinity many times previously.

On the way, they stopped to fill a gasoline can, which was used to douse the apartment with gasoline in order to set a fire that would destroy any evidence.[1] Upon arriving, Duncan entered the apartment alone, leaving the gas can on the front porch.

It is at approximately this point where the stories of defendant and Ms. Duncan diverge. Defendant maintained in two statements given the police, as well as in his testimony at trial, that he never left his father's car that evening and had nothing to do with the strangulation of Lynn Bradfield or with the arson. He claimed that he fell asleep in the car and did not awaken until Duncan returned to the car with the gas can and with "Tiffany", at which time she told defendant "I killed my aunt". Defendant contended that it was Duncan alone who strangled the victim with a dog leash, spirited the baby away, and set fire to the apartment.

According to defendant's second in-custody statement, Duncan carried out a preconceived plan to first strangle the victim with the dog leash while combing her hair, then take the baby, and finally set fire to the apartment. In this statement defendant maintained that, even after driving Duncan to the apartment, he did not believe she would go through with the plan. On the witness stand at trial, and in his earlier statement to the police, defendant denied any prior knowledge of the plan.

The testimony given by Ms. Duncan, the principal prosecution witness, which was consonant with her previous custodial statement, recounted a story quite different from that told by defendant. Duncan's testimony generally accorded with defen-

[1] Defendant testified that Taurus Duncan told him that the gasoline was for a lawn mower.

dant's until the point immediately after she put the dog leash around the decedent's neck.[2] At that juncture, while she held the leash tightly, she signalled defendant to enter the apartment by flicking the porch light on and off. Defendant next entered the apartment, argued with Duncan, and then told her that they had to go through with it.

According to Duncan, defendant grabbed the victim by the hair, while simultaneously grabbing the leash, and then dragged her upstairs. Duncan took "Tiffany" and then left the apartment, leaving defendant alone with the decedent, whom Duncan said was gagging but still alive.

Duncan waited in the car for defendant. They had left another child in the apartment, as per the plan to substitute another infant for "Tiffany". As they drove away, Ms. Duncan saw flames coming from the apartment.

Defendant raises a number of issues on appeal which merit discussion. In particular, he argues against the admission into evidence at trial of the two statements he made to the police. The first was made July 25, 1977, before any statement was given the police by Taurus Duncan; the second was made the following day, July 26. The two custodial statements of defendant, inconsistent with each other as well as with defendant's testimony at trial, supplied the major ammunition for the impeachment of defendant by the prosecution and served to discredit, or at least cast doubt upon, substantial portions of defendant's testimony in his own behalf on direct examination.

---

[2] Defendant, at least at trial and in his first custodial statement, denied aiding Duncan in formulating the plan to murder Lynn Bradfield or of having any knowledge before the fact regarding the same, although he did admit at all times to a general knowledge of Duncan's threats to kill the victim and take "her" baby.

## II

Defendant first contends that the trial court reversibly erred in admitting his statement of July 25, as it was the product of an illegal arrest, one made in the absence of probable cause. Since the arrest, if one can be said to have occurred, was illegal, the statement should have been excluded as fruit of the poisonous tree.

We must initially determine whether an arrest in the Fourth Amendment sense took place on July 25. The trial court ruled that one had not.

On July 25, 1977, a Lieutenant Stewart of the Detroit Police called the Taylor Police Department and gave them defendant's name and address, as well as informing them of a conversation he had had with defendant and defendant's cousin, a Detroit policeman, a few days earlier. The substance of that conversation led Stewart to believe that defendant was possibly involved in the Bradfield murder. Stewart had told defendant to go to the police, and when he called the Taylor police and learned that defendant had not contacted them, Stewart gave them the above-described information.

Acting on this lead, Taylor police went to defendant's residence, arriving before defendant. When defendant drove up, he was approached by two officers who identified themselves and informed defendant that it was their understanding he had information relating to a killing. Defendant was told that the officers wanted to talk to him at the police station.

Defendant responded that he had intended to go to the Taylor Police Department and speak with someone, but that he had not yet gotten around to it. Defendant agreed to go to the police station with the officers. Defendant was given the option

of riding with the police or of following in his own car, according to the officers. Defendant denied being given a choice.

Before being placed in the police car, defendant was patted down, but he was not handcuffed. Defendant claimed that he was told he was under arrest, but the officers denied telling defendant either that he was or was not under arrest. One of the officers present at that time testified that, while he did not feel that defendant had been placed under arrest, defendant would not have been allowed to leave if he asked to do so. The officer also said that if defendant had attempted to leave he would have been placed under arrest.

Arriving at the station, defendant was neither fingerprinted nor booked, but instead was taken to the detective bureau. Apprised of his Miranda[3] rights, defendant proceeded to give his first statement, which was tape recorded. He was then released.

The Michigan Supreme Court has recently reexamined the constitutional law relating to arrests in *People v Summers,* 407 Mich 432; 286 NW2d 226 (1979). The Court quoted from *Terry v Ohio,*[4] which quotation in relevant part declared:

" 'Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' " *Summers, supra,* 444.

Thus, the *sine qua non* for an arrest or "seizure" of the person of a defendant is a significant re-

_____

[3] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[4] 392 US 1, 19, fn 16; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

straint of freedom, an intrusion more severe than a *Terry*-type "stop and frisk". *Summers, supra,* 444-446. As noted by the Court in *Summers,* the *Terry* rationale is extremely limited in scope and will justify only brief on-the-street stops, with attendant questioning regarding suspicious activity, and limited weapons-frisks when necessary to insure safety. *Id.,* 447. It is obvious, therefore, that · *Terry* cannot be used to justify the actions of the police in the case at bar.

Plaintiff however argues that defendant *voluntarily* accompanied the police to the station following a *request* to do so, and, as such, no arrest took place. Defendant argues to the contrary, claiming that, because the police intended to exercise control over the defendant and because the circumstances indicated that defendant *reasonably* believed that he was under police control, there was an arrest, a "seizure" of his person for Fourth Amendment purposes.

An examination of this constitutional claim requires us to review the facts of this case in light of the holdings in *Brown v Illinois,* 422 US 590; 95 S Ct 2254; 45 L Ed 2d 416 (1975), and *Dunaway v New York,* 442 US 200; 99 S Ct 2248; 60 L Ed 2d 824 (1979).

As *Brown* points out, mere recitation of the *Miranda* warnings will not serve as a panacea, validating an otherwise unconstitutional seizure of the person of a defendant on less than full probable cause and rendering admissible in evidence any fruits derived therefrom, including an otherwise voluntary confession. *Brown, supra,* 601-603. The warnings are instead but one of several factors to be looked at in determining whether a confession is obtained by exploitation of an illegal arrest and become relevant at the point where the

Fourth and Fifth Amendment protections interface.

We must yet confront the antecedent question of whether an arrest took place. In deciding this question, we look to *Dunaway* to provide the analytical framework.

In *Dunaway,* the police located the defendant, who was suspected of a crime, at a neighbor's home and drove him to the police station for questioning. Although defendant was not told he was under arrest, he would have been physically restrained if he had attempted to leave.

The Supreme Court found that the police actions were violative of the Fourth Amendment, as there was no probable cause to arrest the defendant. Relying on the language found in *Terry,* quoted hereinbefore, the Court concluded that defendant had been "seized" within the meaning of the Fourth Amendment under that standard. The Court upheld the finding of the trial court that defendant did not voluntarily accompany the police, stating in footnote 6 of Justice Brennan's majority opinion:

" 'It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person,' *Terry v Ohio,* 392 US 1, 16 (1968). Respondent contends that petitioner accompanied the police voluntarily and therefore was not 'seized.' Brief for Respondent 7-9. The County Court found otherwise, App 117, quoted *supra,* at p 205; and the Appellate Division treated the case as an involuntary detention justified by reasonable suspicion. See *[People v Dunaway,]* 61 App Div 2d [299], at 302-303, 402 NYS2d [490], at 492 [(1978)]. See also ALI, Model Code of Pre-Arraignment Procedure § 2.01(3) and commentary, p 91 (Tent Draft No. 1, 1966) (request to come to police station 'may easily carry an implication of obligation, while the appearance itself, unless clearly

stated to be voluntary, may be an awesome experience for the ordinary citizen')." *Dunaway, supra,* 207.

The Court went on to hold that an involuntary detention such as had occurred in that case could be justified only upon a showing of full probable cause to arrest. In elaborating thereon, the *Dunaway* Court opined:

"[T]he detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law. The mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, see *Cupp v Murphy,* 412 US 291; [93 S Ct 2000; 36 L Ed 2d 900] (1973), obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny." *Dunaway, supra,* 212.

The circumstances present in the instant case cannot be distinguished from those which controlled in *Dunaway.* Of crucial import are the facts that defendant was never expressly told that his appearance at the station was voluntary, that he was never informed that he was "free to go", and that he would have been restrained if he refused to go to the station or had tried to escape the officers' custody. Moreover, the fact that defendant was given the option of driving his own car to the

station carries *de minimis* weight insofar as it is relevant to the question of whether he accompanied the officers voluntarily and whether the fact that he had a choice in the matter had been communicated to him. When defendant returned home, he was met by two policemen who were total strangers to him and who expressed a desire that defendant accompany them.

We conclude that this situation was pregnant with the "implication of obligation", and, as such, we cannot say that defendant voluntarily accompanied the police. Accordingly, we hold that the actions of the police in this case constituted a "seizure" of defendant's person under the Fourth Amendment, and that such arrest, conceded to have been made in the absence of probable cause, was illegal.

However, this alone does not per se require the suppression of the statement made by defendant to the police on July 25. Under Fourth Amendment rubric, the confession must be excluded from evidence only if it was obtained by exploitation of the illegal arrest, *i.e.,* if it was the product of the illegal arrest. *Brown v Illinois, supra,* 603, *Dunaway v New York, supra,* 216-218. The focus is on the causal nexus between the illegality and the confession, or, to put it another way, the question is whether the connection was sufficiently attenuated to permit the use at trial of the evidence obtained during the period of illegal detention: whether the statement was purged of its primary taint. *Brown, supra,* 602-604, *Dunaway, supra,* 217-218, and the cases cited therein.

*Brown* sets out a number of factors which are relevant in determining the admissibility of a confession obtained while a defendant is illegally detained:

"The question whether a confession is the product of a free will under *Wong Sun [v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963)] must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution." (Footnotes and citations omitted.) *Brown, supra,* 603-604.

While not expressly enumerated as a factor worthy of consideration, we find that any antecedent circumstances, *i.e.,* events transpiring prior to the "arrest", may well be relevant to the question of whether the statement should be excluded. We do not perceive an intention by the Court to make the factors listed in *Brown* exclusive and/or exhaustive.

The voluntariness of the confession in a Fifth Amendment sense is not directly challenged. However, as *Brown* points out, the Fourth Amendment question is whether the statement is "sufficiently" an act of free will so as to purge the primary taint of the unlawful arrest. *Brown, supra,* 599. Phrased another way, we must determine if the confession was obtained by means sufficiently distinguishable to be purged of the primary taint. That is why the giving of the *Miranda* warnings, although a factor operating in favor of admissibility under *Brown,* is not alone dispositive of the causal nexus question.

Militating against admissibility was the temporal proximity between the arrest and the confession as well as the fact that there was no intervening event of significance whatsoever. So too, as in *Brown*, the arrest of defendant without probable cause therefor had a "quality of purposefulness" about it, although it was much less of a "fishing expedition" for evidence than the police actions were in that case, and surely less flagrant misconduct. *Dunaway* adds little to this analysis, as the Court therein characterized that case as "virtually a replica of the situation in *Brown*". *Dunaway, supra,* 218.

What we find to be the factor which distinguishes the case at bar from *Brown* and *Dunaway* is the conversation involving defendant that took place prior to his arrest and confession, which, in our opinion, operated to sufficiently attenuate any causal connection between the arrest and the giving of the inculpatory statement by defendant so as to justify the admission of the confession in evidence at trial. The necessary nexus was not present because, as we see it, the quintessential variable which compelled or motivated defendant to make a confession was his earlier discussion with his cousin and Lieutenant Stewart, at which time he made a statement which contained the essence of his later July 25 confession, plainly was made of defendant's own volition, without the inherent coercion of a custodial environment or any other compunction, and was told to a police officer defendant had never previously met. Also supportive of this conclusion is defendant's statement to the Taylor police at the time he was first approached by them, to the effect that he had intended to come speak with them but had not yet done so. More importantly, defendant, immedi-

ately following his conversation with Lieutenant Stewart, had expressed an intention to turn himself in to the Taylor police while accompanied by counsel.

We find these circumstances to be sufficient to satisfy the prosecution's burden of showing that the custodial statement given by defendant to the Taylor police on July 25 was sufficiently an act of free will to justify admission, *i.e.,* that the confession was not obtained by exploitation of the illegal arrest under the standard announced in *Brown* and explicated in *Dunaway.*

## III

Defendant next assigns as reversible error the admission into evidence of his custodial statement of July 26, 1977, a claim inextricably intertwined in large part with his contentions regarding the statement of July 25. This statement was given to police after Taurus Duncan had made a confession to the police, which confession was substantially at odds with defendant's statement of July 25 and which indicated a materially greater degree of culpability and participation in the planning and actual killing of Lynn Bradfield than defendant had previously admitted.

Defendant specifically argues that: (1) this statement was the product of an illegal arrest; and (2) it was coerced by the implicitly threatening comments of the interrogating officer.

We reject the former contention, as it is predicated upon the holding of *Brown v Illinois, supra,* that the second statement of the defendant therein was inadmissible because it was clearly the product of that defendant's first inadmissible confession. Here, we have already determined that de-

fendant's first statement was admissible, inasmuch as it was not the product of an illegal arrest. Therefore, even if the second statement flowed inexorably from the first, it would not be the direct or indirect product of the primary taint or illegality, defendant's arrest, nor would it be infirm as being a direct result of the first confession, as that confession was clearly valid. *Wong Sun v United States,* 371 US 471, 484-485, 488, 491; 83 S Ct 407; 9 L Ed 2d 441 (1963).

We are likewise unpersuaded by defendant's argument that his second statement was coerced by the implicitly threatening comments of the interrogating officer to the effect that defendant could be charged with first-degree murder.[5] As

---

[5] The substance of the officer's statement to defendant was as follows:

"Okay, Lawrence, as we explained to you yesterday, we felt sure you had information regarding this case that would be important to the case and after we talked to you yesterday, and after we talked to Taurus, now that's been confirmed. And we know there are certain things that occurred that night that you are aware of that you participated in. Now, you have already cleared up a certain amount of things and the other problem that arises is that after talking with Taurus, she tells us a number of things that differ from what you told us.

"Now, here's the position that it puts you in. You agreed to take a polygraph and I assume that you will take one. Now you realize that she took a polygraph and failed the polygraph and that's one thing that put us both—that put us on to both of you. And if you take a polygraph and fail it, you are sure to be placed under arrest and charged with first degree murder.

"I have had some conversation again this morning with the lieutenant from the homicide squad. He has talked with your cousin, evidently and the thing that we're most concerned about now is clearing up the total part that you have in the situation.

"Now, Taurus has made certain accusations and some of the things you told us differ greatly from what she told us. We want to make sure you weren't mistaken when you told us certain things yesterday.

"The other thing I want to impress on you is that she is going to come off pretty good because she's cleared up. She has been very straightforward. She came and told us what she has been involved in. That's going to help her a long way as far as what people are going to think or whether she is telling the truth or whether she is lying.

"She sat here and very candidly told us word for word what she

noted by the trial judge, some of the language used by the police was objectionable and bordered on being threats. However, we believe that defendant was led to make this second statement for reasons other than these "threats" or any other language of the interrogating officer which could be construed to be promises of leniency.

This Court will not reverse a trial court's finding that a confession was voluntary unless it is left with a firm conviction that a mistake was made. *People v Smith,* 80 Mich App 106, 111; 263 NW2d 306 (1977), *lv den* 406 Mich 920; 275 NW2d 259 (1979). Reviewing the totality of the circumstances, we are not left with such a conviction. The factors which we find persuasive are: (1) that the previous day defendant gave a statement which tended to implicate him in the murder; (2) at that time, defendant agreed to return voluntarily to the station for further questioning; and (3) upon his arrival, he was informed that Taurus Duncan had given a statement differing from his earlier statement, from which the police knew to a greater

---

thought occurred that night. At this point, we don't know if she is telling the complete truth or if she is lying a little bit. I tend to believe an awful lot of what she told us and the thing I want to impress upon you is that if she goes into this situation and clears up her part completely, she stands a chance of coming out of it pretty decent.

"If you go into it and withhold information for whatever reason, to protect her or to protect yourself, protect your family, more of it is going to be dumped on you. You already realize that. If you get involved and go to trial, that she is going to go on the stand and be— she is going to say one thing and people may or may not believe what she says more than what you say. So how you handle yourself now is very important.

"All right, if you are candid with us, if you clear up everything you are involved in, that is going to go a long way in helping what is going to happen to you. The problem is, if you lie to us and if we find out you are lying, it's going to go against you.

"So you have already agreed to come forward and tell us what parts you knew. All we are asking now is that you tell us the truth.

"The first question I want to ask you about is the automobile."

degree of certainty that defendant was involved. We further note that a confession will not be found to be coerced merely because the police confront the defendant with the evidence against him, as was the case here. *People v Ricky Smith,* 85 Mich App 32, 47-48; 270 NW2d 697 (1978). We conclude that the above factors impelled defendant to make the second statement, more so than any language used by the interrogating officer, and uphold its admission into evidence at trial.

## IV

We find no reversible error in the trial court's refusal to suppress the identification testimony of a witness who claimed to have seen defendant walking near the scene of the homicide around the time it occurred. We cannot say that the court below was clearly in error in concluding that the prosecution acted in good faith in telling defense counsel that no identification testimony would be heard from that witness and that, therefore, suppression of such testimony was unnecessary. *People v Ulrich,* 83 Mich App 19, 21; 268 NW2d 269 (1978), *cf., People v Amison,* 70 Mich App 70, 76-82; 245 NW2d 405 (1976).

Our review of the record indicates that the witness inadvertently viewed defendant through a courtroom door window while jury voir dire was being conducted and recognized him. The witness had mistakenly shown up at the courthouse believing he was to testify that day. We do not believe that the witness's identification testimony at trial was solely, if at all, the product of this chance viewing. Moreover, the record is clear that the police felt that the man the witness saw the night of the murder was not defendant because of the discrepancy between the witness's description of

the clothes that man was wearing and the description of the clothes worn by defendant that night given by defendant himself and by Taurus Duncan.

Defense counsel could have requested that a lineup be held for that witness, notwithstanding the representations of the prosecution. Counsel also could have attempted to contact the witness for purposes of conducting his own investigation and, thus, must share the responsibility for the loss of any meaningful lineup evidence. Moreover, it is clear that a defendant is not entitled to a lineup as a matter of right, *People v Mann,* 89 Mich App 511, 515; 280 NW2d 577 (1979), and that the granting of a pretrial lineup is a matter addressed to judicial discretion. *People v Farley,* 75 Mich App 236, 239; 254 NW2d 853 (1977). Therefore, even if defendant had been informed that the witness would identify defendant at trial, there was no assurance that a request to hold a lineup would have been granted, although we would assume such request would have been granted if made. In sum, although the prosecution's representations may have dissuaded defense counsel from seeking a lineup, they did not foreclose addressing such request to the trial judge. Counsel's lack of due diligence in a situation where multifarious methods of discovering favorable evidence were at his disposal militates against suppression of the identification testimony. In addition, defendant has made no preliminary showing, other than conjecture, that any identification evidence flowing from a lineup would necessarily have been favorable to his defense, even under the liberalized standard found in *People v Amison, supra,* 77-78.

Finally, the identification at trial was not subject to exclusion on the ground that the pretrial

identification procedure was impermissibly sugges-
tive, as the witness's initial perception of defen-
dant on the night of the homicide would provide
an independent basis for the in-court identification
under *People v Kachar,* 400 Mich 78, 91-97; 252
NW2d 807 (1977), notwithstanding the prosecu-
tion's doubts. For all the above reasons, we con-
clude that suppression of the identification testi-
mony was not required.

## V

Defendant's claim that he was denied a fair trial
as a result of the manner in which a jury view of
the area near where the victim was killed was
held, at defense counsel's request, is similarly
wanting in merit. *People v Connor,* 295 Mich 1, 6;
294 NW 74 (1940).

## VI

Defendant next urges us to find reversible error
in the cross-examination of defendant by the pros-
ecutor, wherein the prosecutor asked defendant if
defendant, his wife, and Taurus Duncan had all
slept together. Although no objection was made at
trial, defendant argues that the prejudice which
inheres from such questioning resulted in manifest
injustice requiring reversal even in the absence of
objection. Initially, we note that earlier in the trial
defense counsel in cross-examining Taurus Duncan
inquired of her whether she had ever said that, if
she could not have defendant, no one would. The
witness acknowledged making the statement in
the presence of defendant's wife. On redirect, the
prosecution established that defendant's wife knew
that Ms. Duncan and defendant were lovers.
Defendant denied on direct examination that his

wife knew of his relationship with Duncan. The disputed cross-examination ensued shortly thereafter.

Clearly, the relationship between Ms. Duncan and defendant was relevant to the case because it was Duncan who allegedly influenced defendant to commit the offense. During the course of the trial, counsel for both sides were given wide latitude in exploring the nature of that relationship. Defense counsel first raised the question of Taurus Duncan's relationship with defendant's wife. Once defense counsel had opened the door to this line of inquiry, the prosecution was entitled to question defendant regarding his wife's knowledge of the relationship.

Although the question put forward by the prosecutor had little, if any, relevance to the issue of defendant's wife's knowledge of defendant's relationship with Ms. Duncan, we do not perceive it to have resulted in manifest injustice which denied defendant a fair trial, especially given the fact that the defense pursued similar collateral lines of inquiry. Nor do we charge the trial court with an abuse of discretion in allowing the same. *People v Johnson,* 393 Mich 488, 498-499; 227 NW2d 523 (1975), *People v Dye,* 356 Mich 271, 277; 96 NW2d 788 (1959), *People v Duke,* 50 Mich App 714, 717; 213 NW2d 769 (1973), *lv den* 393 Mich 753 (1974), *People v Kincade,* 61 Mich App 498, 506; 233 NW2d 54 (1975). Therefore, we decline to reverse on this ground.

## VII

Defendant raises a final issue meriting discussion. He claims that he was denied a fair trial because Taurus Duncan was allowed to assert her patient-psychiatrist privilege, thereby preventing

the psychiatrists whom she had visited following the murder from testifying. Defendant argues that, when an accomplice testifies on behalf of the state and implicates a third person, he or she waives any and all privileges. Also, absent access to statements made by Ms. Duncan to her psychiatrists, defendant was not able to effectively impeach her testimony, which impeachment was crucial to the defense, and was thereby denied his right of confrontation.

Plaintiff contrarily contends that the privilege in issue here can be waived only when the witness testifies as to matters about which the psychiatrist has personal knowledge, not when the testimony of the psychiatrist would serve merely to impeach the patient-witness's credibility. Moreover, as no offer of proof was made as to the nature of the testimony which would be offered if the privilege were found to be waived, such defect precludes reversal on this basis.

On cross-examination Ms. Duncan testified that she had seen a psychiatrist since the killing. However, she denied that the reason therefor was because she had dreams of Lynn Bradfield burning.

When defense counsel attempted to call a psychiatrist who had seen Duncan, the prosecution objected, arguing that any testimony relative to such visits was barred by the psychiatrist-patient privilege.

A case factually quite similar to the instant case is *People v Bortnik,* 28 Mich App 198; 184 NW2d 275 (1970). There, an alleged accomplice testified against the defendant and then denied any knowledge of a "deal" with the prosecution made in exchange for his testimony. When defense counsel attempted to call the accomplice's attorney to

question him regarding the "deal" for the purpose of impeaching the accomplice-witness's prior testimony, the trial court ruled that the communications between the witness and his attorney were privileged.

This Court disagreed, ruling that "[w]hen an accomplice testifies on behalf of the state and implicates a third person he waives any and all privileges. He cannot testify to those facts supporting his story and then claim privilege to defeat cross-examination." *Bortnik, supra,* 200. The Court went on to reverse defendant's conviction and remand for a new trial at which the privilege was to be inapplicable. We note that *Bortnik* has neither been followed nor rejected in any subsequent decision of this Court.

However, a more recent case, *People v Davis,* 91 Mich App 434; 283 NW2d 768 (1979), *lv den* 407 Mich 868 (1979), held that, at least in the discovery context, a generalized claim of privilege must yield *only* to a demonstrated specific need for evidence in a pending case, *i.e.,* that the evidence sought must be "demonstrably relevant". *Id.,* 442. In that case, defendant sought to discover records of complainant's treatment for alcoholism, contending that the records bore directly on the defendant's defense of consent. This Court reversed the lower court's order allowing discovery.

Assuming the narrower *Davis* standard is now the correct one to apply to a factual situation such as in *Bortnik* and the case *sub judice,* we cannot say that that standard was satisfied here. The evidence sought might possibly have been proven to be "demonstrably relevant", but in the absence of any offer of proof affirmatively indicating that it was, we decline to speculate to that end. In addition, the failure to make an offer of proof with

regard to excluded testimony normally precludes appellate review. *Illenden v Illenden,* 46 Mich App 710; 208 NW2d 565 (1973), *lv den* 390 Mich 783 (1973), MRE 103(a)(2).

Were we to review this issue insofar as it relates to defendant's Sixth Amendment claim of a denial of his right of confrontation, we would nonetheless find no reversible error. We are unable to say that, assuming the evidence was erroneously excluded, such error was decisive to the outcome of the case. See *People v Merchant,* 86 Mich App 355, 358; 272 NW2d 656 (1978). Alternatively, we find any error caused by the exclusion to be harmless beyond a reasonable doubt. *People v Christensen,* 64 Mich App 23, 32-34; 235 NW2d 50 (1975), *lv den* 397 Mich 839 (1976).

## VIII

We conclude that none of the claimed errors necessitates reversal and, therefore, affirm defendant's convictions and sentences.

Affirmed.

M. F. CAVANAGH, J., concurs in the result only.